# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 25, 2012          Decided April 5, 2013

No. 11-7127

MAGLOIRE K. PLACIDE AYISSI-ETOH,
APPELLANT

v.

FANNIE MAE, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-01259)

---

*Magloire K. Ayissi-Etoh*, pro se, argued the cause and filed the briefs for appellant.

*Damien G. Stewart* argued the cause for appellees.   With him on the brief was *Madonna A. McGwin*.

Before: GARLAND, *Chief Judge*, and GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

PER CURIAM: Placide Ayissi-Etoh worked at Fannie Mae. He is African-American. When Ayissi-Etoh was promoted but denied a salary increase, he was allegedly told by his Fannie Mae manager: "For a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money." On another occasion, a Fannie Mae Vice President allegedly shouted at Ayissi-Etoh to "get out of my office nigger." After Ayissi-Etoh filed a discrimination complaint with the Equal Employment Opportunity Commission, his Fannie Mae supervisor allegedly gave him a choice: drop the racial discrimination claim or be fired. Shortly thereafter, Ayissi-Etoh was terminated.

In the District Court, Ayissi-Etoh alleged that Fannie Mae violated federal anti-discrimination laws by (i) denying him a salary increase for discriminatory reasons, (ii) maintaining a racially hostile work environment, and (iii) retaliating against him for filing a discrimination complaint. He also filed a D.C. law claim for defamation. The District Court granted Fannie Mae summary judgment on each count.

At the summary judgment stage, we must view the evidence in the light most favorable to Ayissi-Etoh, the non-moving party. Analyzing the record in that light, we conclude that a reasonable jury could find that Fannie Mae unlawfully discriminated against, harassed, and retaliated against Ayissi-Etoh. Ayissi-Etoh is thus entitled to a trial on those claims. Therefore, we reverse the District Court's grant of summary judgment on all of Ayissi-Etoh's federal anti-discrimination claims.

3

I

In the spring of 2008, Fannie Mae hired Placide Ayissi-Etoh – an African-American man – as a Senior Financial Modeler in its Internal Audit Department. Ayissi-Etoh analyzed the models that Fannie Mae used to assess the value of its assets.

After working at Fannie Mae for about three months, Ayissi-Etoh applied for and received a promotion to "Modeling Team Lead," a new leadership position created when Fannie Mae restructured its Internal Audit Department. There were a total of 12 new Team Lead positions established within the Internal Audit Department. After the Team Leads were selected, 11 of the 12 Leads were given significant salary increases. Ayissi-Etoh was the lone Team Lead who did not receive a raise. Karla Kucerkova – a white employee who applied for Modeling Team Lead but lost out to Ayissi-Etoh – received a salary increase even though she did not obtain one of the Team Lead positions.

Soon after Ayissi-Etoh stepped into the role of Team Lead, he and his manager, Sanda Pesut, began arguing on a regular basis. Pesut criticized Ayissi-Etoh for several "performance shortcomings," and Ayissi-Etoh complained that he was still being assigned staff-level work despite his promotion. Ayissi-Etoh claims that Pesut treated him poorly because he had obtained the Modeling Team Lead position over Pesut's choice for the promotion, Kucerkova.

In the fall of 2008, upon instruction from Human Resources, Pesut began writing reports to document Ayissi-Etoh's perceived weaknesses. In one evaluation, Pesut criticized what she saw as Ayissi-Etoh's lack of independent analysis. Pesut noted that, in Ayissi-Etoh's

description of why certain audit procedures were utilized, the "explanations used were exactly the same as" the explanations submitted by Fannie Mae's customer through email. For his part, Ayissi-Etoh perceived the evaluation as an accusation of plagiarism.

Concerned by both the negative reviews and his lack of a raise, Ayissi-Etoh met with Jacqueline Wagner, the Chief Audit Executive, several times during October 2008. According to Ayissi-Etoh, when he asked why he hadn't received a raise, Wagner – who is white – replied: "For a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money." Wagner denies making this comment.

In early 2009, Thomas Cooper – who is white – became Fannie Mae's Vice President of Internal Audit. He thus presided over the Modeling Team at the time that the tensions between Pesut and Ayissi-Etoh escalated.

On March 19, 2009, Ayissi-Etoh met with Cooper to discuss the fact that he was still performing staff-level work despite being a Team Lead. The meeting quickly became heated. At the end of the meeting, Ayissi-Etoh claims that Cooper yelled, "Get out of my office nigger." Cooper denies making this remark.

After leaving Cooper's office, Ayissi-Etoh apparently became ill. He emailed Pesut that he was "not feeling well right now" and asked to go home. Later that day, Ayissi-Etoh saw a doctor. The doctor diagnosed Ayissi-Etoh with anxiety disorder and prescribed medication.

The next day, Ayissi-Etoh emailed Fannie Mae's CEO about the incident. He also filed a discrimination complaint

against Cooper with the company's Compliance and Ethics Department. Ayissi-Etoh's complaint against Cooper was consolidated with his previously filed complaints against Wagner and Pesut.

Fannie Mae hired an external firm to handle the investigation. The investigation lasted about three months. During that time, Ayissi-Etoh was required to continue working under Cooper.

Fannie Mae's outside investigators found it "highly likely" that Cooper had in fact uttered a "highly offensive racial slur" when confronting Ayissi-Etoh. As a result of that finding, Fannie Mae immediately terminated Cooper.

In the summer of 2009, Ayissi-Etoh filed discrimination claims with the Equal Employment Opportunity Commission. He alleged race discrimination in his pay and racial harassment.

On September 22, 2009, Ayissi-Etoh claims that Pesut gave him a choice between dropping his claims with the EEOC and being fired. Pesut denies this. Three weeks later, Fannie Mae fired Ayissi-Etoh. Ayissi-Etoh then added a retaliation claim to his EEOC complaint.

Ayissi-Etoh subsequently filed this suit in the District Court. As relevant here, Ayissi-Etoh advanced four claims. He alleged (i) that Fannie Mae and Wagner denied him a salary increase because of his race; (ii) that Fannie Mae subjected him to a racially hostile work environment; (iii) that Fannie Mae fired him in retaliation for his filing discrimination claims with the EEOC; and (iv) that Pesut defamed Ayissi-Etoh when she accused him of plagiarism. The District Court granted Fannie Mae's motion for summary

judgment. *See Etoh v. Fannie Mae*, 883 F. Supp. 2d 17 (D.D.C. 2011). Ayissi-Etoh contends that the District Court erred in granting summary judgment against him.

## II

We review motions for summary judgment de novo and consider the evidence in the light most favorable to the non-moving party – here, Ayissi-Etoh. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Stewart v. St. Elizabeths Hospital*, 589 F.3d 1305, 1307 (D.C. Cir. 2010).

## A

Ayissi-Etoh claims that he was denied a raise because of his race, in violation of 42 U.S.C. § 1981.

Section 1981 prohibits private employers from intentionally discriminating on the basis of race with respect to the "benefits, privileges, terms, and conditions" of employment. 42 U.S.C. § 1981; *see Runyon v. McCrary*, 427 U.S. 160, 170 (1976). In Section 1981 and Title VII cases, courts use the same framework for determining whether unlawful discrimination occurred. *See generally* ROTHSTEIN ET AL., EMPLOYMENT LAW § 2.40 (4th ed. 2009); *see also U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711 (1983); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1]

---

[1] Title VII and Section 1981 differ in certain respects. *See generally* ROTHSTEIN ET AL., EMPLOYMENT LAW § 2.40 (4th ed. 2009); Danielle Tarantolo, *From Employment to Contract: Section 1981 and Antidiscrimination Law for the Independent Contractor Workforce*, 116 YALE L.J. 170, 193-95 (2006). For example, Section 1981 covers discrimination on the basis of race, whereas

For purposes of summary judgment, the operative question under Section 1981 – as under the Title VII anti-discrimination framework – is whether "the employee produced sufficient evidence for a reasonable jury to find that . . . the employer intentionally discriminated against the employee on the basis of race." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). In some employment discrimination cases, there is no direct evidence of discriminatory intent – that is, no "statement that itself shows racial or gender bias in the [employment] decision." *Vatel v. Alliance of Auto. Manufacturers*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). Those cases sometimes can be resolved on summary judgment. But when the plaintiff offers direct evidence of discriminatory intent, that evidence will "generally entitle a plaintiff to a jury trial." *Id.*

Here, Ayissi-Etoh claims that Wagner explicitly denied him a raise because of his race. According to Ayissi-Etoh, Wagner said: "For a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money." To be sure, Wagner denies making this statement. But when the issue comes down to a credibility contest of this kind, we cannot resolve the dispute at the summary judgment stage against the non-moving party. And the "young black man" statement alone is direct evidence that in this case entitles Ayissi-Etoh to a jury trial. *See id.*;

---

Title VII covers discrimination on the basis of race, gender, pregnancy, national origin, and religion. *Compare* 42 U.S.C. § 1981, *with* 42 U.S.C. §§ 2000e, 2000e-2(a)-(b). And Section 1981 covers only intentional disparate-treatment discrimination, whereas Title VII allows plaintiffs to bring disparate-impact suits when a facially neutral policy has a disproportionate impact on a protected class. *See General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375, 387-88 (1982).

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (plaintiff may prevail at trial when he "is able to produce direct evidence of discrimination").

We therefore reverse the grant of summary judgment on the Section 1981 race discrimination claim.

B

Ayissi-Etoh next contends that Fannie Mae maintained a racially hostile work environment in violation of 42 U.S.C. § 1981. To support this claim, Ayissi-Etoh cites, among other things, Cooper's use of an offensive racial epithet while yelling at Ayissi-Etoh; Fannie Mae's delay in subsequently separating Ayissi-Etoh and Cooper from having to work together; and Wagner's racially explicit statements to Ayissi-Etoh about the salary, which we described above.

To prevail on a hostile work environment claim, a plaintiff must first show that he or she was subjected to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).

In evaluating a hostile work environment claim, the court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).

We conclude that a reasonable jury could find Cooper and Wagner's behavior sufficiently severe or pervasive as to create a hostile work environment. To begin with, Cooper (allegedly) used a deeply offensive racial epithet when yelling at Ayissi-Etoh to get out of the office. As other courts have observed, "perhaps no single act can more quickly alter the conditions of employment" than "the use of an unambiguously racial epithet such as 'nigger' by a supervisor." *Rodgers v. Western-Southern Life Insurance Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (internal quotations omitted). This single incident might well have been sufficient to establish a hostile work environment. But there was still more here. The incident was preceded by Wagner's "young black man" statement that, as we have already held, was sufficient to support Ayissi-Etoh's claim that Fannie Mae intentionally denied him a raise on the basis of race. Moreover, this incident was followed by Ayissi-Etoh allegedly having to continue working with Cooper for nearly three months, until Cooper was ultimately fired. Medical records allegedly demonstrate that forcing Ayissi-Etoh to continue working with Cooper made Ayissi-Etoh ill and caused him to miss work on at least one occasion.

To establish a hostile work environment claim, a plaintiff must pass one additional hurdle: To establish liability when a plaintiff is harassed by *his or her co-workers*, the plaintiff must prove that the employer was at least negligent in not preventing or correcting the harassment. *See Faragher*, 524 U.S. at 789. When, as here, the plaintiff is harassed by *supervisors* with "immediate (or successively higher) authority," the supervisors are treated as the employer's proxy. *Id.* at 807. In that circumstance, the employer is vicariously liable for a supervisor's actions, except when no tangible adverse employment action has been taken and the

employer proves an affirmative defense: (i) that it exercised reasonable care to prevent and promptly correct the hostile behavior, *and* (ii) that the employee unreasonably failed to take advantage of the employer's preventive or corrective opportunities. *See id.*; *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).[2]

Here, there is no dispute that Cooper and Wagner were Ayissi-Etoh's supervisors. Therefore, Fannie Mae would be vicariously liable based on their alleged comments, save for any affirmative defense. Fannie Mae suggests that it may be entitled to the affirmative defense because it promptly corrected Cooper's behavior by firing him three months after the incident. But a reasonable jury could find that three-month delay was not "prompt." Moreover, Fannie Mae makes no attempt to argue that Ayissi-Etoh unreasonably failed to take advantage of its complaint system – which is an additional necessary component of the affirmative defense. Indeed, Ayissi-Etoh filed a complaint with Fannie Mae's Compliance and Ethics Department the day after the incident in Cooper's office. At the summary judgment stage, Ayissi-Etoh has thus provided sufficient evidence for a reasonable jury to find Fannie Mae liable.

We therefore reverse the grant of summary judgment on the hostile work environment claim.

---

[2] Some courts continue to cite the test articulated by the Eleventh Circuit in *Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982). That case required an employee in a case where the employee was harassed by a supervisor to prove that the employer "knew or should have known of the harassment in question and failed to take prompt remedial action." *Id.* That is no longer the test after *Faragher*.

C

Ayissi-Etoh also alleges that Fannie Mae fired him in retaliation for his filing of EEOC complaints. He brings the retaliation claim under 42 U.S.C. § 1981.

To establish a retaliation claim under Section 1981, a plaintiff must show that he engaged in protected activity – such as filing an EEOC complaint – and that his employer took an adverse employment action against him because of that activity. *See Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006).

In his affidavit, Ayissi-Etoh offers direct evidence of retaliation: He claims that Pesut gave him a choice between dropping his claims with the EEOC and being fired. Pesut denies making that statement. On summary judgment, however, we cannot resolve this credibility contest.

Because Ayissi-Etoh's account could lead a reasonable jury to return a verdict in his favor on the retaliation claim, we reverse the District Court's grant of summary judgment on that claim.

D

Finally, Ayissi-Etoh claims that Fannie Mae is liable under D.C. law for defamation because its employee Pesut accused Ayissi-Etoh of plagiarism.

To meet the requirements for defamation under D.C. law, a plaintiff must prove (i) that he was the subject of a false and defamatory statement; (ii) that the statement was published to a third party; (iii) that publishing the statement was at least negligent; and (iv) that the plaintiff suffered either actual or

legal harm. *See Crowley v. North American Telecommunications Association*, 691 A.2d 1169, 1173 n.2 (D.C. 1997).

Ayissi-Etoh's defamation claim fails because Pesut's statements were not false. In both her evaluation and her subsequent emails, Pesut noted that the explanations Ayissi-Etoh used in his audit review were "exactly the same as" the "customer's response" to one of Ayissi-Etoh's questions. Ayissi-Etoh's final audit review indisputably contains language identical to the customer's response. Because Pesut simply stated the truth – that part of Ayissi-Etoh's audit review directly incorporated responses from a customer's email – the defamation claim fails.

We therefore affirm the District Court's grant of summary judgment on Ayissi-Etoh's D.C. law defamation claim.

\* \* \*

We reverse the District Court's grant of summary judgment with respect to the race discrimination, hostile work environment, and retaliation claims. We affirm the District Court's grant of summary judgment with respect to Ayissi-Etoh's D.C. law defamation claim.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring: I join the Court's opinion and write separately to underscore an important point about Ayissi-Etoh's hostile work environment claim.

The briefing and argument in this case focused on a significant question: Can one isolated yet severe incident of discriminatory conduct establish a hostile work environment under federal anti-discrimination laws? Fannie Mae has argued that a "singular comment" – even one as severe as the Fannie Mae Vice President's alleged statement to Ayissi-Etoh, "Get out of my office nigger" – is "insufficient to establish an actionable hostile work environment." Fannie Mae Br. 47. In my view, Fannie Mae is wrong on the law and wrong on the application of the law to the alleged facts of this case. The alleged statement by the Fannie Mae Vice President to Ayissi-Etoh by itself would establish a hostile work environment for purposes of federal anti-discrimination laws.

To be sure, as Fannie Mae notes, cases in which a single incident can create a hostile work environment are rare. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("isolated incidents (unless extremely serious) will not amount to" a hostile work environment); *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Except in extreme circumstances, courts have refused to hold that one incident is so severe to constitute a hostile work environment. Even a few isolated incidents of offensive conduct do not amount to actionable harassment.") (citation omitted); *Freedman v. MCI Telecommunications Corp.*, 255 F.3d 840, 848-49 (D.C. Cir. 2001) (single incident of "religious slander" does not create a hostile work environment).

But saying that a single incident of workplace conduct *rarely* can create a hostile work environment is different from saying that a single incident *never* can create a hostile work environment. The test set forth by the Supreme Court is

whether the alleged conduct is "sufficiently severe *or* pervasive" – written in the disjunctive – not whether the conduct is "sufficiently severe *and* pervasive." A single, sufficiently severe incident, then, may suffice to create a hostile work environment. *See* EEOC COMPLIANCE MANUAL, SECTION 15: RACE AND COLOR DISCRIMINATION 37 (2006) ("a single, extremely serious incident of harassment may be sufficient to constitute a Title VII violation"); *see also id.* ("The more severe the harassment, the less pervasive it needs to be, and vice versa.").

Courts and commentators alike agree that a single *physical* act – such as a physical assault – can create a hostile work environment. *See, e.g.*, *Turnbull v. Topeka State Hospital*, 255 F.3d 1238, 1243 (10th Cir. 2001) (case concerning sexual assault where court stated: "Because frequency is merely one factor in the analysis, an isolated incident may suffice if the conduct is severe and threatening."); *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999) (" 'extremely serious' acts of harassment" like physical assault may be severe and need not also be pervasive) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) ("even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability"), *abrogated on other grounds by Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998); 3 LEX K. LARSON, EMPLOYMENT DISCRIMINATION § 46.05[3][b] (2d ed. 2012) ("a single incident of physical assault against a co-worker that is motivated by anti-female animus can qualify as severe enough to constitute an alteration of the co-worker's conditions of employment").

As several courts have recognized, moreover, a single *verbal* (or visual) incident can likewise be sufficiently severe to justify a finding of a hostile work environment. *See, e.g.*, *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 909 (8th Cir. 2003) (racially hostile graffiti that amounted to death threat qualifies as "severe"); *Richardson v. N.Y. State Dept. of Correctional Service*, 180 F.3d 426, 437 (2d Cir. 1999) (case involving the use of several racial epithets and insults where court stated: "even a single episode of harassment, if severe enough, can establish a hostile work environment"), *abrogated on other grounds by Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006); *cf. Jackson v. Flint Ink North American Corp.*, 370 F.3d 791, 795 (8th Cir. 2004) ("Even a single instance of workplace graffiti" involving a burning cross, "if sufficiently severe, can go a long way toward making out a Title VII claim"), *rev'd on reh'g on other grounds*, 382 F.3d 869 (8th Cir. 2004).

It may be difficult to fully catalogue the various verbal insults and epithets that by themselves could create a hostile work environment. And there may be close cases at the margins. But, in my view, being called the n-word by a supervisor – as Ayissi-Etoh alleges happened to him – suffices by itself to establish a racially hostile work environment. That epithet has been labeled, variously, a term that "sums up . . . all the bitter years of insult and struggle in America," LANGSTON HUGHES, THE BIG SEA 269 (2d ed. 1993) (1940), "pure anathema to African-Americans," *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001), and "probably the most offensive word in English," RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 894 (2d rev. ed. 2000). *See generally* ALEX HALEY, ROOTS (1976); HARPER LEE, TO KILL A MOCKINGBIRD (1960). Other courts have explained that "perhaps no single act can more quickly alter the conditions of employment and create an abusive

working environment than the use of . . . 'nigger' by a supervisor in the presence of his subordinates." *Spriggs*, 242 F.3d at 185. No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans.

In short, the case law demonstrates that a single, sufficiently severe incident may create a hostile work environment actionable under 42 U.S.C. § 1981 or Title VII. Here, as I see it, the alleged statement by the Fannie Mae Vice President to Ayissi-Etoh itself would establish a hostile work environment. With that understanding, I join the Court's opinion.