PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-1473

REYA C. BOYER-LIBERTO,

             Plaintiff - Appellant,

        v.

FONTAINEBLEAU CORPORATION, trading as Clarion Resort
Fontainebleau Hotel; LEONARD P. BERGER,

             Defendants - Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.    James K. Bredar, District Judge.
(1:12-cv-00212-JKB)

Argued:  January 29, 2014              Decided:  May 13, 2014

Before TRAXLER, Chief Judge, and NIEMEYER and SHEDD, Circuit
Judges.

Affirmed by published opinion.    Judge Niemeyer wrote the
opinion, in which Judge Shedd joined.    Judge Shedd wrote a
separate concurring opinion.    Chief Judge Traxler wrote an
opinion concurring in part and dissenting in part.

**ARGUED:**  Robin Ringgold Cockey, COCKEY, BRENNAN & MALONEY, PC,
Salisbury, Maryland, for Appellant.   Harriet Ellen Cooperman,
SAUL EWING LLP, Baltimore, Maryland, for Appellees.   **ON BRIEF:**
Brett S. Covington, SAUL EWING LLP, Baltimore, Maryland, for
Appellees.

NIEMEYER, Circuit Judge:

Reya C. Boyer-Liberto, an African-American woman, commenced this action against her former employer, the Fontainebleau Corporation, trading as Clarion Resort Fontainebleau Hotel, in Ocean City, Maryland, and its owner, Leonard Berger, for racial discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. She grounds her racial discrimination claim on a hostile work environment allegedly created by two conversations she had with a coworker about an incident that occurred on September 14, 2010. During the conversations, which took place on two consecutive days, the coworker twice called Liberto a "porch monkey." And she grounds her retaliation claim on the termination of her employment after she complained about the statements.

The district court granted the defendants' motion for summary judgment, concluding that the conduct was too isolated to support either of Liberto's claims.

For the reasons that follow, we affirm.

I

Liberto began working at the Clarion Resort Fontainebleau Hotel (the "Clarion") on August 4, 2010. The Clarion is a typical oceanfront hotel, with several restaurants, bars, a nightclub, and banquet facilities, and it typically employs 75

2

people in its service department.  Liberto began as a morning hostess in one of the hotel's restaurants.

According to Richard Heubeck, the Clarion's Food and Beverage Director, Liberto "didn't seem to be happy in [the morning hostess] position."  He stated that she had difficulty keeping pace with the job and that it was not a "good fit" for her.  Because Liberto had previously expressed a preference for other jobs in the hotel, she was allowed to work in other departments, engaging in serving and bartending, as well as working banquets.  According to Berger, the Clarion's owner, Liberto also struggled with these other jobs.  As he stated, she behaved unprofessionally, clashed with other employees, disregarded Clarion policy, and responded poorly to criticism.  Berger said that because Liberto "had failed at four jobs" and had failed the Clarion bartending test, he terminated her employment on September 21, 2010.

During her employment, Liberto interacted with Trudy Clubb, a longtime employee at the Clarion and a friend of Berger.  Clubb described herself as a restaurant "manager," reporting to Food and Beverage Director Heubeck, as well as Mark Elman, another supervisor.  While Clubb's exact role at the Clarion is not made clear in the record, Clubb described her job as "getting things going for the early part of the day, seeing that the crew is well-equipped and ready to present themselves to the

3

customers, getting the tables ready, getting the buffet . . . ready, [and] overseeing all the items that need to be done." Clubb was not involved in the hiring and disciplining of fellow employees.

Liberto testified during her deposition that she never understood Clubb to be a supervisor or manager. Liberto said that she "was told by [her] co-workers that [Clubb] was just Dr. Berger's friend and she was just there to say 'hello' and greet people as a glorified hostess." She also stated that she was never told that Clubb was a manager; to the contrary, she was told that Clubb "did not have the power to . . . make decisions" and did not have management cards or keys. Liberto stated that she herself reported to Heubeck and to another manager named "Jamie." She acknowledged that she did listen to Clubb, but she did so only to the extent that she had "to be respectful and listen to anyone [she] work[ed] with." While Clubb would occasionally ask Liberto or other employees to do something, Liberto testified that "it was not a regular routine . . . for [Clubb] to instruct[]" other employees, and Clubb did not ever correct the work that Liberto did.

When Liberto and Clubb were first introduced, Clubb compared Liberto with another employee, stating, "You look like Stacy, but Stacy's nice," which Liberto took as offensive. But

4

the incident central to this action occurred on September 14, 2010, more than a month after Liberto had been hired.

On the evening of September 14, Liberto was serving drinks to customers, and one customer ordered a "Hula-Hula," a drink that was particularly time-consuming to make. When the bartender at the Clarion's primary bar refused to make the drink, Liberto went through the kitchen to order the drink from the Clarion's "pub bar." While passing through the kitchen, Clubb called out to Liberto several times, telling her not to use the kitchen as a shortcut. Liberto did not hear Clubb's calls. When Clubb finally got Liberto's attention, Clubb began yelling at Liberto for not acknowledging her when she had tried to get Liberto's attention. Liberto said that the distance between the two was close enough that she could "[feel] Clubb's breath" and spittle from Clubb's mouth was hitting her. Clubb called Liberto "deaf" and said that she was "going to make [Liberto] sorry." As the conversation concluded, Clubb called Liberto a "porch monkey."

When Liberto went to Heubeck's office the next day to complain about Clubb's conduct, Clubb came in and said to Liberto, "I need to speak to you, little girl." The two then spoke alone outside the office, and Clubb scolded her for "abandoning [her] station" the previous day. As this meeting broke up, Clubb again called Liberto a "porch monkey."

Liberto reported the conduct to Nancy Berghauer, the Clarion's Human Resources Director, and the two spoke over the telephone on September 17, 2010. Berghauer made typewritten notes of the conversation and forwarded them to Berger and Elman. Elman met with Liberto to discuss the situation and to ensure that Berghauer's notes were correct. The next day, September 18, Heubeck met with Clubb, who denied Liberto's allegations. He nonetheless issued her a written warning.

One day prior to Heubeck's meeting with Clubb, Berger and Heubeck discussed Liberto's performance problems, as well as her conflict with Clubb. During the conversation, Berger observed that Liberto had substantial performance issues and felt that the Clarion "should terminate her." Over the next few days, before Berger had made a final decision on Liberto's employment, he discussed Liberto's performance with Elman and Berghauer. When Berger looked at Liberto's work file, he discovered that she had failed the Clarion's bartending test. Elman and Berghauer both told Berger that "because of [Liberto's] complaint, [firing her] could create a situation." Berger replied that "there's not going to be any good time to let her go. The situation will be there." On September 21, Berger terminated Liberto's employment. He asserted in his deposition that Liberto's allegations against Clubb did not play any part

in his decision. Moreover, Clubb was not involved in the decision, only learning of it a week later.

Liberto filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 23, 2010, alleging discrimination based on her race and retaliation based on her engagement in protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The EEOC issued Liberto a Notice of Right to Sue, following which Liberto commenced this action.

In her complaint, Liberto asserted four claims for relief: two counts of racial discrimination, in violation of Title VII (Count I) and 42 U.S.C. § 1981 (Count III), and two counts of retaliation, also in violation of Title VII (Count II) and 42 U.S.C. § 1981 (Count IV).

Following discovery, the defendants filed a motion for summary judgment. In deciding the motion, the district court excluded from consideration the "vague" answers to interrogatories given by Liberto, which were not executed on personal knowledge and included hearsay. The court did, however, take as true the testimony in Liberto's deposition, in which she described the two conversations in which Clubb called her a "porch monkey." The court held that based on the summary judgment record so defined, the offensive conduct was too isolated to support Liberto's claims for discrimination and

7

retaliation. Accordingly, by order dated April 4, 2013, the court entered judgment in favor of the defendants.

This appeal followed.

II

Liberto contends first that the district court erred in excluding her answers to interrogatories as part of the summary judgment record. The court concluded that the answers were not only "vague as to time, place, and identity of the hearer" but also were not based on Liberto's personal knowledge. Liberto had executed the answers with the oath that they were true "to the best of [her] knowledge, information and belief." Moreover, in the text of the answers themselves, Liberto stated that the information was "not based solely upon [her] knowledge . . . but include[d] the knowledge of [her] agents, representatives, and attorney." The answers identified 14 other persons who had knowledge of the relevant facts, as alleged in the complaint.

Liberto nonetheless argues that the language referring to other persons' information and her belief was "a boilerplate disclaimer" that is "commonly used." She explains, "Obviously, a lay plaintiff cannot be expected to answer complicated discovery requests fully and accurately without the benefit of counsel."

As the Advisory Committee's notes to Federal Rule of Civil Procedure 56 observe, "the very mission of the summary judgment

8

procedure is to pierce the pleadings and <u>to assess the proof</u> in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee's note (1963 amends.) (emphasis added). Because the Rule is a mechanism to obviate trial, the facts forming the basis for a summary judgment must (1) be material, Fed. R. Civ. P. 56(a); (2) be undisputed, <u>id.</u>; and (3) be admissible in evidence, Fed. R. Civ. P. 56(c)(2), (4). Thus, a declarant of facts used to support or oppose a motion for summary judgment must demonstrate that he or she has personal knowledge of the facts and is competent to testify to them. <u>See</u> Fed. R. Civ. P. 56(c)(4); <u>see also</u> <u>Szego v. Comm'r</u>, No. 91-2153, 1993 U.S. App. LEXIS 14645, at *4-5 (4th Cir. June 17, 1993) (per curiam) (concluding that interrogatory answers were not properly in the summary judgment record because they were filed by the defendant's attorney and not based on the defendant's <u>personal knowledge</u>); <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991) (noting that a verified complaint could be used to oppose a motion for summary judgment "when the allegations contained therein [were] based on <u>personal knowledge</u>" (emphasis added)); <u>Md. Highways Contractors Ass'n v. Maryland</u>, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment").

While it is no doubt true that answers to interrogatories are routinely given on "knowledge, information and belief," if a declarant wishes to use such answers to support or oppose a motion for summary judgment, she must either state the information in an affidavit that complies with Rule 56 or execute the answers to interrogatories on personal knowledge.

In this case, Liberto did neither. Liberto supplied her answers to interrogatories based not only on her own knowledge, but also on information she received from others and on her belief that the information was true. And in this case, the information was explicitly stated to have been obtained from her agents, representatives, and attorney. Such evidence certainly would not be admissible at trial, as it would amount to hearsay, speculation, or both.

We conclude that the district court did not err in excluding Liberto's answers to interrogatories from consideration as part of the summary judgment record.

III

Liberto next contends that the district court erred in ruling as a matter of law that the undisputed facts in the summary judgment record, viewed in the light most favorable to her, did not demonstrate a hostile work environment, as prohibited by Title VII and 42 U.S.C. § 1981. She argues that

10

the use of the term "porch monkey" was particularly severe and humiliating and that, because the duration of her employment was short, Clubb's two uses of the term were relatively frequent. Moreover, she argues, because Clubb was physically close to her during the first conversation when the term was used, it was threatening.

The "porch monkey" term that Clubb used was indeed racially derogatory and highly offensive, and nothing we say or hold condones it. Nonetheless, we conclude that a coworker's use of that term twice in a period of two days in discussions about a single incident was not, as a matter of law, so severe or pervasive as to change the terms and conditions of Liberto's employment so as to be legally discriminatory.

Title VII makes it unlawful for an employer to discriminate against an individual with respect to her compensation, terms, conditions, or privileges of employment because of her race, color, religion, sex, or national origin. See 42 U.S.C. § 2000e-2(a)(1). And requiring an employee to work in a "discriminatorily hostile or abusive environment" violates that provision. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

11

working environment." Id. (internal quotation marks and citation omitted). In making a determination whether an employer has created an abusive working environment, a court is required to examine "all the circumstances[, including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 22; see also Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011).

Viewing the facts of the summary judgment record, we conclude that Liberto has not presented evidence such that a reasonable juror could find that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris, 510 U.S. at 21 (internal quotation marks and citation omitted). Particularly important is the fact that Liberto points to only two conversations, on consecutive days, in which Clubb called her a "porch monkey," both of which arose from a single incident at the Clarion. Our cases have made it clear that "[u]nlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." Jordan v. Alternative Resources Corp., 458 F.3d 332, 339 (4th

12

Cir. 2006); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct").  While Clubb's statements to Liberto were racially derogatory and highly offensive, as we have noted, they were singular and isolated, and Liberto has not pointed to any other specific indicators in the record that Clubb, or any other employee, made racist or hostile statements to her.

Liberto relies on three cases that, she argues, support her claim of racial discrimination through a hostile work environment:  Tawwaab v. Virginia Linen Servs., Inc., 729 F. Supp. 2d 757 (D. Md. 2010); Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir. 2001); and Ayissi-Etoh v. Fannie Mae, 712 F.3d 572 (D.C. Cir. 2013).  None of these cases, however, advances her argument.

In Tawwaab, an African-American employee at a linen and laundry service was consistently harassed by his supervisor, Miller, regarding his race.  As the court observed:

> Carter alleges that Miller constantly used racial slurs and profane insults in his presence in reference to the African-Americans he supervised that included the terms "dumb," "stupid," "motherfuckers," "black motherfuckers," "bastards," "black bastards," and "black Fresh Princes of Bel-Air."  Carter alleges that Miller did not use this type of invective when addressing white employees.  He specifically identifies an incident wherein Miller said of Virgil Wingate, another African-American route sales representative:  "I can't stand that black

13

motherfucker. I'm going to kick that black bastard's ass and drag his motherfucking ass across the fucking parking lot, black bastard. I can't stand that motherfucker."

\* \* \*

Miller also allegedly made racial jokes in Carter's presence about traditional African-American hairstyles and "ethnic-sounding" names. In addition, Miller kept a statue on his desk of what Plaintiffs assert is an African-American golf caddy with the appearance of a monkey, and that Miller would deliberately place this statue in front of Carter and other African-American employees when he would meet with them, as if to say, "This is what I think of you. You are monkeys to me."

Id. at 766. In denying the defendant's summary judgment motion, the court noted that the plaintiff "identified approximately ten actionable incidents of harassment that took place between 2005 and 2007" and that several of the incidents were particularly offensive, involving "at least some kind of physical threat." Id. at 778. In contrast, Liberto only refers to two conversations, about a single incident, occurring on consecutive days, during which Clubb twice used a racial epithet.

Similarly, in Spriggs, the offensive statements at issue, which were made by the plaintiff's supervisor, included nearly every racist insult one can imagine, including "nigger," "black bitch," "monkey," and "dumb monkey," extending repeatedly over the course of two stints of employment spanning three years. 242 F.3d at 182. In vacating summary judgment entered in favor of the defendants, the court emphasized the "frequency" of the

14

comments.  Id. at 185.  Again, that circumstance is not presented in this case.

Finally, in Ayissi-Etoh, the plaintiff -- an African-American senior financial modeler -- asked a white supervisor why he had not received a raise in conjunction with a recent promotion.  Ayissi-Etoh, 712 F.3d at 574-75.  In response, he was told, "For a young black man smart like you, we are happy to have your expertise; I think I'm already paying you a lot of money."  Id. at 575.  Several months later, during a discussion with a more direct supervisor about the plaintiff's work responsibilities, the supervisor yelled at him, "Get out of my office nigger."  Id.  The plaintiff was forced to continue working with the second supervisor, eventually causing the plaintiff to have an anxiety disorder and miss work.  The plaintiff brought, inter alia, a hostile work environment claim and a claim that he was denied a raise because of his race, both under 42 U.S.C. § 1981.  The D.C. Circuit concluded that the defendant was not entitled to summary judgment on either claim. Id. at 576-77.  Those circumstances, however, are substantially distinguishable from those in this case. First, as the court in Ayissi-Etoh noted, the hostile work environment was not precipitated by a single event, but rather by two independent statements having ongoing applicability, made by two different supervisors of the plaintiff, ultimately leading to health

15

problems and directly causing the plaintiff to miss work.  Id. Additionally, the racist comments were made during conversations directly about the plaintiff's pay and work assignments -- clear situations in which the statements "alter[ed] the conditions of the victim's employment."  Harris, 510 U.S. at 521.  In contrast, this case presents statements made by a coworker, that did not relate to Liberto's terms of employment and did not have long-term ongoing consequences.

Liberto has not pointed to any Fourth Circuit case, nor could she, finding the presence of a hostile work environment based on a single incident.  Compare Jordan, 458 F.3d at 340 (addressing a single racist statement directed in response to a television news report and made in the presence of plaintiff and noting that it was "a far cry from alleging an environment of crude and racist conditions so severe or pervasive that they altered the conditions of [plaintiff's] employment"), with Anderson v. G.D.C., Inc., 281 F.3d 452, 459 (4th Cir. 2002) (denying summary judgment where plaintiff was "subjected, on a daily basis, to verbal assaults of the most vulgar and humiliating sort"); Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 196 (4th Cir. 2000) (noting "frequency and regularity of the unwelcome conduct"); Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995) ("[C]o-workers abused [plaintiff] almost daily, calling him names like

16

'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf'").

Liberto's hostile work environment claim under 42 U.S.C. § 1981 is governed by the same principles applicable to her hostile work environment claim under Title VII.  See Spriggs, 242 F.3d at 184.  And because we conclude that Liberto has not demonstrated a hostile work environment under Title VII, we likewise conclude that she has not done so under § 1981.[*]

IV

Finally, Liberto contends that the district court erred in dismissing her retaliation claims under Title VII and 42 U.S.C. § 1981.  She asserts that her employment was terminated because she complained about Clubb's "porch monkey" statements.  In

_____

[*] Defendants also argue that Clubb was not Liberto's "supervisor" and therefore that her comments were not imputable to defendants for purposes of a violation of Title VII or § 1981.  See Vance v. Ball State Univ., 133 S. Ct. 2434 (2013).  They note that Clubb did not have any direct hiring and firing power over Liberto, pointing to Clubb's statement that she did not "make [hiring] decisions.  Those [were] made by human resources and the manager, the other manager."  Moreover, Liberto conceded that she did not consider Clubb her supervisor.  And when Liberto's employer learned of Clubb's offensive comments, it did admonish Clubb, and no further similar incident occurred.  See Vance, 133 S. Ct. at 2441 (noting that when a coworker's conduct is the basis of a hostile work environment claim, employer's liability is based on negligence "with respect to the offensive behavior").  But because we have concluded that Clubb's statements to Liberto did not create a severe or pervasive hostile work environment, we need not reach whether Clubb was in fact a supervisor, thus imputing liability to the Clarion, or whether the Clarion was negligent in how it responded to Liberto's complaint.

17

entering summary judgment on this claim, the district court concluded that she "lacked an objectively reasonable belief that she was actually being subjected to unlawful harassment." Liberto nonetheless argues that rather than assessing whether she had an objectively reasonable belief of harassment, the district court, by requiring that the conduct be sufficiently severe or pervasive, required her to prove actual harassment. In arguing that her belief was an "objectively reasonable" one, she relies on the offensiveness of the "porch monkey" epithet.

To demonstrate retaliation, a plaintiff must show that she was terminated because she engaged in protected activity -- i.e., because she "respond[ed] to an employment practice that [she] reasonably believe[d] [was] unlawful." Jordan, 458 F.3d at 338 (emphasis added). Liberto contends that she had such an objectively reasonable belief based on Clubb's two statements made in relation to the incident on September 14, 2010.

But just as her claim as to an actual hostile work environment failed as a matter of law, her claim that she had an objectively reasonable belief that she was complaining about a hostile work environment fares no better in the circumstances of this case. The conversations forming the basis for Liberto's belief were isolated to one coworker about one incident over two days. And Liberto concedes that Clubb had not called her by racial epithets before or after the conversations at issue here.

18

Moreover, Liberto's relationships with her supervisors and her other coworkers were free from such epithets.

In addition, when these conversations occurred, Liberto thought that she was simply being redressed by a coworker, not her supervisor. When Liberto was asked whether she knew that Clubb was the restaurant manager, Liberto emphatically testified that she did not. In response to the follow-up question, "You never knew throughout your entire employment with the Clarion that she was a manager?" she responded:

> Never. I reported to Jamie, and Jamie, as a matter of fact, told me not to go to [Clubb] because [Clubb] did not have the power to do voids or make decisions. I had to report to Jamie or Richard. And at the time [Clubb] did not hold any management cards or keys as Jamie did.

Liberto explained that she would only listen to Clubb as she would to any other person that she worked with. In these circumstances, Liberto's understanding of Clubb's role lessens the risk that Clubb's statements alone caused Liberto to reasonably believe that Clarion had altered the terms and conditions of her employment. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (noting that "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character").

Finally, the analysis of the hostile work environment claim that we conducted earlier in this opinion tends to confirm the

absence of an objectively reasonable belief that a violation had occurred. In the circumstances of this case, if no objectively reasonable juror could have found the presence of a hostile work environment, as we today hold, it stands to reason that Liberto also could not have had an objectively reasonable belief that a hostile work environment existed.

In short, we conclude that Liberto could not have had an objectively reasonable belief that, in complaining to management about the two related conversations, she was complaining about conduct that was unlawful either under Title VII or § 1981.

Liberto points out that under Title VII, she "need not wait until her work environment is actually hostile and threatening" before her opposition is protected. She is correct in noting that where conduct is likely to ripen into a hostile work environment, the employee's opposition may be protected before the hostile environment has fully taken form. See Jordan, 458 F.3d at 340; E.E.O.C. v. Navy Fed. Credit Union, 424 F.3d 397 (4th Cir. 2005). But this case does not present any indicators that the situation at the Clarion would have ripened into a hostile work environment. There was no series of events that were "set in motion" by Clubb's statements, unlike cases where we have denied summary judgment on a retaliation claim because the conduct complained of was likely to lead to a Title VII violation. See, e.g., Navy Fed., 424 F.3d at 406-08; see also

20

<u>Jordan</u>, 458 F.3d at 341 ("[W]e cannot simply <u>assume</u>, without more, that the opposed conduct will continue or will be repeated unabated"). Indeed, after the incident, Clarion management warned Clubb, and Clubb and Liberto thereafter had no further contact. Moreover, Liberto has pointed to no other specific indicators in the record to evince that workplace racism was afoot before then.

Just as in <u>Jordan</u>, we conclude here that "while in the abstract, continued repetition of racial comments of the kind [Clubb] made might have led to a hostile work environment, no allegation in the [record] suggests that a plan was in motion to create such an environment, let alone that such an environment was even likely to occur." <u>Jordan</u>, 458 F.3d at 340; <u>see also</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) ("A recurring point in [Supreme Court opinions on hostile work environments] is that . . . offhand comments[] and <u>isolated incidents (unless extremely serious)</u> will not amount to discriminatory changes in the 'terms and conditions of employment'" (emphasis added)); <u>Greene v. A. Duie Pyle, Inc.</u>, 170 F. App'x 853, 856 (4th Cir. 2006) (per curiam) (concluding that employer was entitled to summary judgment on retaliation claim because plaintiff, when he made his complaint, did not have an objectively reasonable belief that his employer maintained a hostile workplace where sexual magazines and

21

inappropriate jokes were often posted); <u>Butler v. Ala. Dep't of Transp.</u>, 536 F.3d 1209, 1213-14 (11th Cir. 2008) (holding that coworker's use of the word "nigger" twice in negative reference to a third party was not enough to give plaintiff an objectively reasonable belief that a racially hostile work environment existed so as to support a retaliation claim).

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

22

SHEDD, Circuit Judge, concurring:

I agree with Judge Niemeyer and Chief Judge Traxler that, under our precedent, as a matter of law the facts of this case do not demonstrate a hostile work environment. Based on this Court's decision in Jordan v. Alternative Resources Corp., 458 F.3d 332 (4th Cir. 2006), I agree with Judge Niemeyer that summary judgment should also be affirmed on the retaliation claim.

23

TRAXLER, Chief Judge, concurring in part and dissenting in part:

I agree that under existing precedent, Liberto has not demonstrated a hostile environment under Title VII or § 1981. However, because I believe the district court erred in granting summary judgment on her retaliation claims, I dissent in part.

I.

Viewing the facts in the light most favorable to Liberto, as we must in reviewing an order granting summary judgment against her, see Bland v. Roberts, 730 F.3d 368, 372 (4th Cir. 2013), the record reveals the following. Clarion is a hotel containing guest rooms, a conference center, several restaurants and bars, a banquet facility, and a nightclub. Liberto, who is African-American, began working for Clarion in early August 2010. She trained in each of the hotel's food and beverage positions, including morning restaurant hostess, cocktail waitress, restaurant server, bartender, and banquet-facility server.

On the night of September 14, Liberto was working the cocktail shift when one of her customers ordered a drink that was fairly complicated and time-consuming to make. When the bartender on duty at the main bar refused to make the drink, the bartender at the "pub bar" agreed to do so. After picking up the drink from the pub bar, Liberto passed through the kitchen and into the dining room in order to bring the drink to her

24

customer. While Liberto was still in the dining room, Trudy Clubb, a weekend manager for the hotel, approached her and began "screaming loudly" at her. J.A. 239. Clubb, who is Caucasian, was a long-time employee of the hotel and friend of Dr. Leonard Berger, the hotel's owner.[*] Apparently, Clubb had attempted to get Liberto's attention as Liberto was passing through the kitchen, but Liberto had not heard her. Clubb yelled to Liberto, "Hey, you. Girl that can't hear," and briskly came up to her. J.A. 238. Liberto turned away from Clubb and looked at a computer screen, which further agitated Clubb. As Clubb yelled at Liberto, she stood so close to her that Liberto "could feel her breath" and Clubb's spittle flew into Liberto's face. J.A. 241.

As Liberto attempted to proceed into the dining room to serve a customer, Clubb continued yelling at her, telling her not to walk away. Clubb told Liberto that she was not allowed to go through the kitchen, and she called Liberto "deaf" and told her that Clubb "was going to get" her and "make [her] sorry." J.A. 250, 252-53. Then she called Liberto either a "damn . . . porch monkey" or "dang[] porch monkey" and exited the dining room. J.A. 258. "Porch monkey" is a racial slur

---

[*] When Liberto was first introduced to Clubb, Clubb told her, "[Y]ou look like Stacy, but Stacy's nice." J.A. 212.

used against African-Americans.  See White v. BFI Waste Servs., L.L.C., 375 F.3d 288, 297 (4th Cir. 2004).

The next day, Liberto received similar treatment from Clubb.  Before her dinner shift, as Liberto was in the hotel's management office speaking to Clarion's Food and Beverage Director Richard Heubeck about what had happened the night before, Clubb came into the office, cut Liberto off, and said, "I need to speak to you, little girl."  J.A. 263.  Liberto told Clubb she was speaking to Heubeck, but Clubb replied that she was "more important," and Liberto followed her out of the office.  J.A. 264.  As they sat at a table together, Clubb began to question Liberto again about why she had gone through the kitchen and whether she had asked anyone if she could do so. Clubb again became agitated and again began yelling at Liberto with others in the room.  As the two were getting up, Clubb threatened that "she was going to go to Dr. Berger" and was "going to make [Liberto] sorry."  J.A. 266-67.  She then, in a loud voice, again called Liberto a "porch monkey."  J.A. 267.

Two days later, on September 17, 2010, Liberto complained to Nancy Berghauser, who was Clarion's director of human resources, that on September 14, Clubb, when berating her for cutting through the kitchen and for not responding to Clubb's attempts to get Liberto's attention, had called Liberto a "porch monkey[]" and told Liberto that Clubb was going to "'speak with

26

Dr. Berger'" and "'make [Liberto] sorry.'"  J.A. 316.  Later the same day, Berghauser forwarded her typed notes from her conversation with Liberto to Dr. Berger and Mark Elman, who was the hotel's general manager.  Upon receiving information about Liberto's allegations, Dr. Berger asked Heubeck about Liberto. At the end of their conversation, Dr. Berger decided to terminate Liberto, and Liberto was notified on September 21 that she was being terminated.

Liberto subsequently filed a complaint with the EEOC alleging discrimination due to racial harassment and retaliation – in the form of her discharge – for engaging in protected activity.  The EEOC then issued a right-to-sue letter, and Liberto brought this action asserting claims of racial discrimination and retaliation under Title VII and 42 U.S.C. § 1981.  Following discovery, the defendants filed a motion for summary judgment that the district court granted.

## II.

A plaintiff may demonstrate she was subjected to a racially hostile work environment under Title VII by proving she experienced (1) "unwelcome conduct," (2) that was based upon the her race, (3) that was "sufficiently severe or pervasive to alter [her] conditions of employment and to create an abusive work environment" and (4) that "is imputable to the employer." Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir. 2011).

27

The same test applies to claims brought under 42 U.S.C. § 1981. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001).

I agree with the majority that, under our existing precedent, particularly Jordan v. Alternative Resources Corp., 458 F.3d 332 (4th Cir. 2006), the conduct Liberto complained of as a matter of law did not rise to the level of actionable harassment. However, I part ways with the majority on the question of whether that determination necessarily resolves the retaliation claim as well. See Ante, at 20 ("In the circumstances of this case, if no objectively reasonable juror could have found the presence of a hostile work environment, as we hold today, it stands to reason that Liberto also could not have had an objectively reasonable belief that a hostile work environment existed." (emphasis in original)).

The relevant provision of Title VII, protecting against retaliation, reads:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this title.

42 U.S.C. § 2000e-3(a). "The plain meaning of the statutory language provides protection of an employee's opposition activity when the employee responds to an actual unlawful employment practice." Jordan, 458 F.3d at 338. Nevertheless,

28

we have also held that "opposition activity is protected when it responds to an employment practice that the employee <u>reasonably believes</u> is unlawful." <u>Id.</u> (emphasis in original). Thus, even if the practice opposed does not actually violate Title VII, opposing the practice can be protected conduct if the employee has "an objectively reasonable belief that a violation is actually occurring based on circumstances that the employee observes and reasonably believes." <u>Id.</u> at 341.

In determining whether that standard is met here, I believe it is important to recognize that even "[a] single, sufficiently severe incident . . . may suffice to create a hostile work environment." <u>Ayissi-Etoh v. Fannie Mae</u>, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (concluding that supervisor's statement to African-American employee, "Get out of my office nigger," was sufficient by itself to constitute an actionable hostile work environment). We have explained before that "[f]ar more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans." <u>Spriggs</u>, 242 F.3d at 185. And Liberto may well have held the same belief about the term "porch monkey." <u>See</u> <u>id.</u> (noting that the "constant use of the word 'monkey' to describe African Americans was similarly odious" to the use of the word "nigger").

We, of course, held in <u>Jordan</u> that an offensive racial remark made by a coworker did not amount to actionable

29

harassment, but, in so doing, we emphasized that the complained-of incident was only "a singular and isolated exclamation [that was] not . . . repeated . . . before or after" and that it was directed at criminals on television who had been captured, not at the plaintiff or any fellow employee. Jordan, 458 F.3d at 340. Here, in contrast, Clubb called Liberto herself a porch monkey and did so in the context of angrily threatening to speak with her friend, the hotel owner, to get Liberto fired. Also in contrast to Jordan, Clubb's use of the epithet was not a single, isolated occurrence, as she called Liberto the very same name in the very same threatening context the very next day. Particularly in light of these significant differences, I believe that Liberto could have reasonably believed that Clubb's conduct was actionable.

I share in the sentiment Judge King expressed so well in his dissent in Jordan that our very narrow interpretation of what constitutes a reasonable belief in this context has "place[d] employees who experience racially discriminatory conduct in a classic 'Catch-22' situation." Id. at 349 (King, J., dissenting). They can either report the offending "conduct to their employer at their peril," id. at 355 (King, J., dissenting), as the Supreme Court has essentially required them to do in order to preserve their rights, see Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v.

<u>Ellerth</u>, 524 U.S. 742, 764-65 (1998), or they can "remain quiet and work in a racially hostile and degrading work environment, with no legal recourse beyond resignation," <u>Jordan</u>, 458 F.3d at 355 (King, J., dissenting). Like Judge King, I cannot accept that an employee in circumstances like these can be forced to choose between her job and her dignity. <u>See</u> <u>id.</u> at 356. For these reasons, I respectfully dissent from the affirmance of the summary judgment against Liberto on her retaliation claims.