Vacated and remanded by published opinion. Judge GREGORY wrote the opinion, in which Judge KING and Judge WYNN joined. Judge WYNN wrote a separate opinion concurring in part and concurring in the judgment.
OPINION
GREGORY, Circuit Judge:
Appellant challenges the grant of summary judgment for her employer when her boss forcibly kissed her, fondled her leg, propositioned her, asked sexually explicit questions, described sexual activities he wished to perform, and then, after she spurned the advances and filed a harassment complaint, fired her. Because those allegations are sufficient to make out claims of hostile work environment, quid pro quo harassment, and retaliation, we vacate and remand.
I.
We recite the facts, with reasonable inferences drawn, in favor of the non-movant, Katrina Okoli (Appellant-Plaintiff). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
John P. Stewart is the director of Baltimore’s Commission on Aging and Retirement (“CARE”) and serves in the Mayor’s cabinet. On June 21, 2004, Stewart hired Okoli, an African-American woman, to serve as his executive assistant. The parties agree that for the first few months, Stewart and Okoli worked well together.
Beginning in September 2004, things changed for the worse: Namely, Stewart began propositioning Okoli to have sex with him in a Jacuzzi as part of his sexual fantasy. He first did so on September 13, 2004, during a visit to a CARE facility.[1] During a September 24, 2004 work meeting, Stewart then asked Okoli whether she was wearing any underwear, what color it was, and whether she would come to work the next day without underwear. Next, on October 4, 2004, Stewart told Okoli about a sexual experience he had with an African-American woman and her daughter. Okoli reacted with shock and disgust, which *218 Stewart noticed. Another time, Stewart again mentioned this sexual experience with a mother and daughter. Okoli reiterated that the daughter would despise and regret having such a lewd sexual encounter with her mother. Stewart laughed it off and returned to work, as Okoli suggests he often did.
Stewart continued to proposition Okoli about his Jacuzzi fantasy, and on November 10, 2004, asked her to sit on his lap and to join him in a Jacuzzi in Las Vegas. Whenever Stewart traveled, he continued to request Okoli to join him in his Jacuzzi, and became angry when she rejected his advances. Furthermore, Stewart touched Okoli’s legs under the conference table “two or three times” during their morning meetings. J.A. 17B, 105-06, 319-20. Whenever this occurred, Okoli would move away from Stewart and tell him “don’t do that.” J.A. 17B. In November 2004, Okoli met with a manager about transferring to another department, and in January, Stewart gave her an “informal” performance review with areas of suggested improvement. J.A. 71-72.
On January 10, 2005, Stewart asked Okoli to come back in a conference room, then forcibly grabbed and kissed her. Okoli pushed him away and ran out the door. She was so distraught that she went home and remained there for the day. When she returned to work the next day, Okoli stressed to Stewart that she still wanted to have only a professional relationship. While he initially said “O.K.,” Stewart repeated his Jacuzzi fantasy again that same day. J.A. 9,17B, 90-91.[2]
Okoli then began reaching out for help in various ways, to no avail: On January 26, 2005, Okoli emailed Alvin Gillard, the Executive Director of the Baltimore Community Relations Commission, asking to speak with him about “a complaint.” J.A. 149. Gillard never responded. On March 23, 2005, Okoli emailed Gillard with a “high” importance flag, stating her desire to “file a harassment complaint against my supervisor, Mr. John P. Stewart.” J.A. 171-172. Gillard suggested she speak with an intake specialist during work hours. Okoli also emailed Michael En-right, the First Deputy Mayor, as well as Clarence Bishop, the Mayor’s Chief of Staff, with a “high” importance request to meet with the Mayor as soon as possible. J.A. 176.
On April 1, 2005, Okoli sent a formal complaint to Mayor Martin O’Malley, copying Michael Enright and Clarence Bishop:
... Mr. Stewart displayed unethical and unprofessional business characteristics, e.g., harassment, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues (anyone in the City government) and lack or disregard for integrity.
J.A. 197. Enright promptly forwarded that complaint on to Stewart through En-right’s special assistant, Colm O’Comartun. Later that afternoon, Stewart fired Okoli.[3]
On April 3, 2005, Okoli approached May- or O’Malley after a public speech and asked if he had reviewed her complaint; he said he had not, but would have someone look at it. In an April 5, 2005 memo *219 to the Mayor, Stewart stated generally that he had “never been accused” of such sexual harassment in the past and denied the allegations in Okoli’s April memo. J.A. 246-47. Stewart did not deny or address Okoli’s specific allegations of sexual harassment in either of his two affidavits to the court.
A City human resources official, Kathy Phillips, met with Okoli on April 5, and said Okoli “shared three times in which she felt that she had been sexually harassed.” J.A. 203. Phillips concluded her written summary of the meeting by stating, “I think this goes without saying but I strongly recommend that due to the nature of these allegations, a thorough investigation is necessary. It should be referred to an EEO Officer.” J.A. 208.[4]
On April 29, 2005, Okoli repeated the same allegations to Yolanda Winkler in the Mayor’s office, who referred her to the Baltimore Community Relations Commission (BCRC). On May 5, 2005, Okoli filed a charge of discrimination with the BCRC, claiming harassment, retaliation, and “unsolicited inappropriate touching.” J.A. 212. On July 3, 2005, the Commission dismissed the action for lack of probable cause that Okoli had been discriminated against.
On September 26, 2006, Okoli initiated a pro se action against Stewart, Enright, O’Comartun, the Mayor, CARE, and the City Council of Baltimore (hereinafter, collectively known as “the City”). She asserted claims under Title VII, 42 U.S.C. §§ 1983, 1985, 2000e, common law, and Article 4 § 3-1 of the Baltimore City Code.
On November 16, 2006, the City filed a notice of removal to federal court, where Okoli amended her complaint. Both parties moved for summary judgment and the district court granted the City’s motion. The court analyzed the same three issues which arise in this appeal, hostile work environment, quid pro quo harassment, and retaliation: First, regarding hostile work environment, the court stressed that there were “[j]ust three or four incidents [of physical contact] over a five month period,” and no physical threat to Okoli. J.A. 380. The court also reasoned that Stewart ceased his conduct on his own and “according to [Okoli’s] own positive assessment of her job performance, it is clear that she does not believe that Stewart’s conduct interfered with her work performance.” J.A. 380. The court emphasized that Okoli over-read certain inferences and innocuous gifts, and cited cases where similar or “more egregious” conduct did not constitute a hostile work environment. J.A. 381-82 (citing Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745 (4th Cir. 1996); Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333 (7th Cir.1993)).
Second, regarding quid pro quo, the district court found that there was a legitimate basis to fire Okoli due to “performance issues,” namely her attitude, errors, and absence. J.A. 385. The court found these to be valid grounds for terminating an at-will employee and concluded that her other allegations of adverse actions were not actionable.
Third, regarding retaliation, the district court found that it was “questionable whether the sending of this letter [to the Mayor] constitutes ‘protected activity,’ ” because Okoli made “simply a general complaint about Stewart’s unprofessional *220 behavior.... ” J.A. 389. Even assuming this was protected activity, the court found the retaliation claim failed because Stewart made the decision to terminate her before she sent the letter. The court relied on a computer file’s timestamp to establish this fact.
II.
“In reviewing the grant or denial of a motion for summary judgment, an appellate court conducts a de novo review....” Williams v. Griffin, 952 F.2d 820, 823 (4th Cir.1991). We draw “[a]ll inferences ... in a light most favorable to the non-movant.” Id.
A.
First, Okoli alleges she was subject to a hostile work environment. “To demonstrate sexual harassment and/or a racially hostile work environment, a plaintiff must show that there is ‘(1) unwelcome conduct; (2) that is based on the plaintiffs sex [and/or race]; (3) which is sufficiently severe or pervasive to alter the plaintiffs conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.’ ” Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir.2010) (alteration in original) (quoting Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 192 (4th Cir. 2000)).
The third factor is dispositive here: whether Stewart’s treatment was severe or pervasive enough. The City contends it was not, characterizes Stewart’s conduct as sporadic and infrequent, depicts Stewart as promptly stopping this conduct once Okoli objected, and questions whether some of Stewart’s comments and gifts were sexual at all.
We conclude that Okoli presents a strong claim for hostile work environment. Here, we look to the totality of the circumstances, including the “‘frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.’ ” Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Viewing the facts in the light most favorable to Okoli, she suffered upwards of twelve (12) incidents in just four months: (1) disparaging jokes about gays and lesbians; (2) comments about Okoli and Jacuzzi fantasy; (3) comments about Okoli and group sex fantasy; (4) questions about Okoli’s underwear; (5) comments about sexual relations with another African-American woman; (6) additional inquiries about Okoli sitting on lap and Jacuzzi fantasy; (7-10) three incidents of fondling her leg under a table; (11) forcible kissing; (12) more propositions to join in a Jacuzzi fantasy. These events took place from September 8 through January 11. Functionally, these incidents span fondling, kissing, propositioning, describing sexual activities, and asking intimate questions. Some of the incidents may have been severe enough to be actionable in and of themselves.[5]
*221 Collectively, Okoli was subject to repeated propositioning and physical touching. By any objective and reasonable standard, the allegations here are far beyond “simple teasing [and] offhand comments.” Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (internal quotation marks omitted). Moreover, Stewart’s alleged conduct is much more than “ ‘generalized’ statements that pollute the work environment” — they clearly constitute “ ‘personal gender-based remarks’ that single out individuals for ridicule.” EEOC v. Fairbrook Med. Clinic, 609 F.3d 320, 328-29 (4th Cir.2010). Indeed, the conduct here is arguably at least as severe as conduct we have previously deemed to be actionable. See, e.g., Mosby-Grant v. City of Hagerstown, 630 F.3d 326, 336 (4th Cir.2010) (gender-based language, songs, and comments); Jennings v. Univ. of N.C., 482 F.3d 686, 696 (4th Cir.2007) (en banc) (coach’s explicit inquiries into and comments about student athletes’ sexual lives); Smith v. First Union Nat’l Bank, 202 F.3d 234, 243 (4th Cir.2000) (repeated remarks that belittled employee because she was a woman). Here too, there is a significant “disparity in power,” Jennings, 482 F.3d at 697: Stewart is a political appointee who sits in the Mayor’s cabinet and heads an agency with more than a hundred employees. Okoli was a new secretary whose job required her to have a lot of one-on-one contact with her boss.
Furthermore, the sexual advances here were more numerous and explicit than in Beardsley v. Webb, which Okoli cites. In Beardsley, we found a hostile work environment when, over six months, a supervisor massaged an employees shoulders, stated he wanted to “make out” and “have his way” with her, falsely accused her of having an affair, and asked her about her underwear, birth control, and the bodily effects of taking maternity leave. 30 F.3d 524, 528-29 (4th Cir.1994).[6] Additionally, this case involves more severe accusations of sexual harassment than the pre-Jennings cases which the district court and City cited.[7]
Finally, the district court’s reasoning was flawed in two other ways. First, the court over-emphasized the role of Stewart’s gifts in light of the extensive remarks and touching here. Some of those gifts, such as a holiday card, flag, or tea set, may seem innocuous when viewed alone or out of context. But our legal analysis “re *222 quires careful consideration of the social context in which particular behavior occurs and is experienced by its target.” Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Here, Okoli alleges Stewart was engaging in an escalating pattern of sexual advances. Gifts could certainly have been a part of his effort to coerce Okoli into having sex. A gift which may seem harmless in the abstract can have sexual connotations when delivered with a suggestive comment (this flag is “[ ]sign of bigger and better things to come,” J.A. 88) or symbol (i.e., a phallic or sexual allusion).
Second, the district court reasoned that Stewart’s advances could not have interfered with Okoli’s work since she had a high opinion of her performance. But this conflates aspects of Stewart’s hostile work environment and retaliation claims. Okoli can argue that Stewart negatively impacted her work, while still defending her performance against the City’s attempt to show a legitimate basis for firing her. Indeed “[t]he fact that a plaintiff continued to work under difficult conditions is to her credit, not the harasser’s.” EEOC v. Fairbrook Med. Clinic, 609 F.3d at 330. Overall, Okoli presents a strong claim for hostile work environment, when “ objectively viewing the] severity of harassment ... from the perspective of a reasonable person in the plaintiffs position.” Oncale, 523 U.S. at 81, 118 S.Ct. 998.
B.
Second, Okoli claims she experienced quid pro quo discrimination. This requires an employee prove five elements:
1 The employee belongs to a protected group.
2 The employee was subject to unwelcome sexual harassment.
3 The harassment complained of was based upon sex.
4 The employee’s reaction to the harassment affected tangible aspects of the employee’s compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer’s use of a prohibited criterion in making the employment decision.
5 The employer, as defined by Title VII, 42 U.S.C. § 2000e(b), knew or should have known of the harassment and took no effective remedial action.
Brown v. Perry, 184 F.3d 388, 393 (4th Cir.1999) (emphasis added, citations omitted). With the fourth element, “[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.” Burlington Indust., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The fifth element is “automatically met” when the harassment was alleged to have been perpetrated by a supervisor. Spencer v. General Elec. Co., 894 F.2d 651, 658 n. 10 (4th Cir.1990).
If the plaintiff makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Baqir v. Principi, 434 F.3d 733, 747 (4th *223 Cir.2006). Then, if the employer satisfies its burden, the burden returns to the plaintiff to establish that the employer’s proffered reason is a pretext for discrimination. Baqir, 434 F.3d at 747.
In this case, the inquiry turns on the fourth factor: whether Okoli’s reaction to Stewart’s advances affected “tangible aspects” of her employment. The parties focus mostly on whether Stewart’s decision to conduct an informal performance feedback — as opposed to a formal, periodic performance review — was “tangible” enough. Performance reviews are clearly related to employment and promotion. But the record contains no details about what reviews are standard or required by office policy. The more “tangible” employment action taken by Stewart was Okoli’s allegation that Stewart fired her for rejecting his advances and complaining about his conduct.
The City also maintains it had a legitimate nondiscriminatory reason for terminating Okoli that has not been shown to be pretextual. Okoli must then show that the proffered reason is false: “ ‘In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.’ ” Washington v. City of Charlotte, 219 Fed.Appx. 273, 279 (4th Cir.2007) (unpublished) (Gregory, J., dissenting) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). “ ‘[0]nee the employer’s justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.’ ” Id. at 279-80 (quoting Reeves, 530 U.S. at 147, 120 S.Ct. 2097).
In this case, there is some evidence that Okoli occasionally had scheduling conflicts and made typographical errors. But it appears deeply suspicious that Stewart fired Okoli only hours after she culminated her rejection of him by complaining to the Mayor. There is little in the record to suggest Okoli would have been fired for the occasional typo, notwithstanding her “at-will” employment status. Specifically, Stewart and Okoli’s last disagreements were about whether to meet at 8:30 AM instead of 8:00 AM and 2:15 PM instead of 2:10. J.A. 73-75, 120-22, 146. It is hard to believe those lone scheduling conflicts were so egregious as to provide a legitimate basis for firing Okoli the same afternoon she complained about harassment. “[WJhen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer’s actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration....” Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (emphasis in original).
C.
Third, Okoli maintains that Stewart retaliated against her. “To state a prima facie case of retaliation, a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer’s adverse action.” Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir.1997) (citing Carter v. Ball, 33 F.3d 450, 460 (4th Cir.1994)).
The parties disagree centrally about whether Okoli’s April 1 letter to the Mayor constituted protected activity because it did not explicitly mention sexual harassment. The City also emphasizes that *224 Stewart decided to fire Okoli before she complained, as evinced by his deposition and the timestamp on the computer file he used to fire her. Okoli’s previous complaints are insufficient, according to the City, because they were too vague or too long before she was ultimately fired.
Here, it was enough for Okoli to twice complain of “harassment,” even if it might have been more ideal for her to detail the sexual incidents she later relayed.[8] While Okoli’s January 26 email to Gillard referenced only a “complaint,” her March 23 email was entitled “Harassment Complaint.” J.A. 171 (emphasis added). Okoli’s April 1 memo to the Mayor further described “unethical and unprofessional business characteristics, e.g., harassment, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues (anyone in the City government) and lack or disregard for integrity.” J.A. 197 (emphasis added).
The City surely should have known that Okoli’s complaints of “harassment” likely encompassed sexual harassment.[9] Indeed, Okoli’s description of “unethical,” “degrading and dehumanizing” conduct suggest severe misbehavior related to her identity — not a mere workplace squabble. Moreover, based on his alleged conduct, Stewart himself surely would have known that Okoli was complaining of sexual harassment.
Finally, the district court improperly inferred that Stewart had intended to fire Okoli before she complained simply because his Word document, “Katrina [Okolij.doc” was created on March 23. The court did so largely on the basis of a CARE technician who stated that the file properties show it was created on March 23 and modified on March 31. To therefore infer that Stewart necessarily intended to fire Okoli for legitimate reasons on March 23 was clear error. That a computer file was created on a certain day tells us nothing about its contents on that day. It is entirely possible “Katrina.doc” could have been blank — or contained an unrelated or favorable review of her work, which Stewart later modified. Indeed there is already evidence in the record that Stewart modified his letter three times before delivering it. Okoli’s second amended complaint alleges that Stewart typed up a termination letter after reading her complaint. Viewing the evidence in the light most favorable to Okoli, we can infer that Stewart did not intend to fire her before April 1 — and therefore a genuine dispute of material fact still exists on this front.
Moreover, it is undisputed that Stewart actually fired Okoli only after learning of her complaint. This is unaffected by the fact that he may or may not have had a draft termination letter on his computer beforehand. Even assuming Stewart previously contemplated firing her — Okoli’s complaint might have been an additional or superseding cause of her ultimate termi *225 nation. Regardless, Okoli presented more than an adequate claim that her complaint was “causally connected to the employer’s adverse action.” Beall, 130 F.3d at 619. Any dispute about Stewart’s alternative, legitimate basis for firing her returns to the question of mixed-motives and pretext. For the purposes of summary judgment, Okoli has eliminated legitimate reasons for her firing, so “it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration....” Furnco, 438 U.S. at 577, 98 S.Ct. 2943. We now return this case to a jury to assess and resolve Okoli’s three claims.
III.
For these reasons, the grant of summary judgment is vacated and the case is remanded for further proceedings.

VACATED AND REMANDED

. Also in September 2004, Stewart and others joked about various colleagues' sexual orientation. Okoli told Stewart she did not want to be a part of such conversations. Stewart gave Okoli a miniature American flag as a "□sign of bigger and better things to come." J.A. 88. Stewart later gave or sought to give Okoli other gifts such as coats, lunch, and a holiday greeting card containing cash. When Stewart first started asking if Okoli had a similar Jacuzzi fantasy, she replied "no, not like that,” and said she had not discussed Stewart's proposition for group sex with another colleague. J.A. 89.

. After January 2005, Stewart began criticizing Okoli’s work more harshly, placed added demands on her schedule, spread rumors that she was a lesbian, and reminded her that she was an "at-will” employee. J.A. 17B, 90.

. That morning, Okoli and Stewart also had a disagreement about when the two could meet. Stewart contends he drafted a termination letter on March 23, stemming from the disagreement he had with Okoli about meeting times. Stewart ended up not firing her then and revised his letter on March 24 and 30.

. Okoli told Phillips that she had provided enough information and declined to go into more detail about inappropriate touching. Okoli and Phillips also discussed various ways to resolve the situation, including being placed in a new job or contacting another state agency.

. See, e.g., Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000) (indicating that "a single incident [of sexual harassment that] was extraordinarily severe” can be actionable); E.E.O.C. v. WC&M Enters., Inc., 496 F.3d 393, 400 (5th Cir.2007) (same); Cerros v. Steel Techs., Inc., 288 F.3d 1040, 1047 (7th Cir.2002) (same); Bowen v. Missouri Dep’t of Soc. Servs., 311 F.3d 878, 884 (8th Cir.2002) ("A claimant need only establish discriminatory conduct which is either pervasive or severe.”); Smith v. Northwest Fin. Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir.1997) (same); Reeves v. C.H. Robinson Worldwide, *221 Inc., 525 F.3d 1139, 1146 (11th Cir.2008) (same) (citations omitted).

. The City attempts to distinguish Beardsley because the defendant there had "unequivocally rejected every advance," whereas here Okoli was more tepid and already had poor performance. While some of Okoli’s early responses are somewhat generad, she explicitly told Stewart she was not interested in a sexual relationship on January 11, 2005.

. The City points to Hopkins, where we found no hostile work environment existed when, over a seven year period, a supervisor "bumped into [an employee], positioned a magnifying glass over his crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [the employee’s] wedding, and stared at him in the bathroom ... [but n]ever made an overt sexual proposition or touched [the employee] in a sexual manner.” 77 F.3d at 753. Here, by contrast, the conduct transpired during just over four months, and included more physical contact, more sexual propositions, and more explicit language.
Nor is this case Weiss, where the Seventh Circuit found no hostile work environment when a supervisor asked an employee out on dates, called her a "dumb blond,” touched her shoulder several times, posted "I love you” signs, and tried to kiss her at a bar. 990 F.2d at 334. Stewart’s advances were graphic sexual propositions — not innocuous requests for “dates.” Moreover, Stewart’s comments were far more sexually explicit, and his touching of her leg more intimate, invasive, and unseen.

. Several sister circuits have noted that sexual harassment complaints need not include "magic words” such as "sex” or "sexual” to be effective. See, e.g., Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C.Cir.2006) ("While no 'magic words’ are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition.”); Olson v. Lowe’s Home Ctrs. Inc., 130 Fed.Appx. 380, 391 n. 22 (11th Cir.2005) (unpublished) ("There is no magic word requirement. That is, the employee need not label the events 'sexual harassment’ in order to place an employer on notice of the offending behavior.”).

. Courts and employers generally understand "harassment” to be a term of art. See, e.g., Barbour v. Browner, 181 F.3d 1342, 1355 (D.C.Cir.1999) (discussing "the legal term of art ‘harassment.’ ”).