TRAXLER, Chief Judge,
concurring in part and dissenting in part:
I agree that under existing precedent, Liberto has not demonstrated a hostile environment under Title VII or § 1981. However, because I believe the district court erred in granting summary judgment on her retaliation claims, I dissent in part.
I.
Viewing the facts in the light most favorable to Liberto, as we must in reviewing an order granting summary judgment against her, see Bland v. Roberts, 730 F.3d 368, 372 (4th Cir.2013), the record reveals the following. Clarion is a hotel containing guest rooms, a conference center, several restaurants and bars, a banquet facility, and a nightclub. Liberto, who is African-American, began working for Clarion in early August 2010. She trained in each of the hotel’s food and beverage positions, including morning restaurant hostess, cocktail waitress, restaurant server, bartender, and banquet-facility server.
On the night of September 14, Liberto was working the cocktail shift when one of her customers ordered a drink that was fairly complicated and time-consuming to make. When the bartender on duty at the main bar refused to make the drink, the bartender at the “pub bar” agreed to do so. After picking up the drink from the pub bar, Liberto passed through the kitchen and into the dining room in order to bring the drink to her customer. While Liberto was still in the dining room, Trudy Clubb, a weekend manager for the hotel, approached her and began “screaming loudly” at her. J.A. 239. Clubb, who is Caucasian, was a long-time employee of the hotel and friend of Dr. Leonard Berger, the hotel’s owner.* Apparently, Clubb had attempted to get Liberto’s attention as Liberto was passing through the kitchen, but Liberto had not heard her. Clubb yelled to Liberto, “Hey, you. Girl that can’t hear,” and briskly came up to her. J.A. 238. Liberto turned away from Clubb and looked at a computer screen, which further agitated Clubb. As Clubb yelled at Liberto, she stood so close to her that Liberto “could feel her breath” and Clubb’s spittle flew into Liberto’s face. J.A. 241.
As Liberto attempted to proceed into the dining room to serve a customer, Clubb continued yelling at her, telling her not to walk away. Clubb told Liberto that she was not allowed to go through the kitchen, and she called Liberto “deaf’ and told her that Clubb “was going to get” her and “make [her] sorry.” J.A. 250, 252-53. Then she called Liberto either a “damn ... porch monkey” or “dang[ ] porch monkey” and exited the dining room. J.A. 258. “Porch monkey” is a racial slur used against African-Americans. See White v. BFI Waste Servs., L.L.C., 375 F.3d 288, 297 (4th Cir.2004).
The next day, Liberto received similar treatment from Clubb. Before her dinner shift, as Liberto was in the hotel’s management office speaking to Clarion’s Food and Beverage Director Richard Heubeck about what had happened the night before, Clubb came into the office, cut Liberto off, *362 and said, “I need to speak to you, little girl.” J.A. 263. Liberto told Clubb she was speaking to Heubeck, but Clubb replied that she was “more important,” and Liberto followed her out of the office. J.A. 264. As they sat at a table together, Clubb began to question Liberto again about why she had gone through the kitchen and whether she had asked anyone if she could do so. Clubb again became agitated and again began yelling at Liberto with others in the room. As the two were getting up, Clubb threatened that “she was going to go to Dr. Berger” and was “going to make [Liberto] sorry.” J.A. 266-67. She then, in a loud voice, again called Liberto a “porch monkey.” J.A. 267.
Two days later, on September 17, 2010, Liberto complained to Nancy Berghauser, who was Clarion’s director of human resources, that on September 14, Clubb, when berating her for cutting through the kitchen and for not responding to Clubb’s attempts to get Liberto’s attention, had called Liberto a “porch monkey[]” and told Liberto that Clubb was going to “ ‘speak with Dr. Berger’ ” and “ ‘make [Liberto] sorry.’ ” J.A. 316. Later the same day, Berghauser forwarded her typed notes from her conversation with Liberto to Dr. Berger and Mark Elman, who was the hotel’s general manager. Upon receiving information about Liber-to’s allegations, Dr. Berger asked Heubeck about Liberto. At the end of their conversation, Dr. Berger decided to terminate Liberto, and Liberto was notified on September 21 that she was being terminated.
Liberto subsequently filed a complaint with the EEOC alleging discrimination due to racial harassment and retaliation — in the form of her discharge — for engaging in protected activity. The EEOC then issued a right-to-sue letter, and Liberto brought this action asserting claims of racial discrimination and retaliation under Title VII and 42 U.S.C. § 1981. Following discovery, the defendants filed a motion for summary judgment that the district court granted.
II.
A plaintiff may demonstrate she was subjected to a racially hostile work environment under Title VII by proving she experienced (1) “unwelcome conduct,” (2) that was based upon the her race, (3) that was “sufficiently severe or pervasive to alter [her] conditions of employment and to create an abusive work environment” and (4) that “is imputable to the employer.” Okoli v. City of Baltimore, 648 F.3d 216, 220 (4th Cir.2011). The same test applies to claims brought under 42 U.S.C. § 1981. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir.2001).
I agree with the majority that, under our existing precedent, particularly Jordan v. Alternative Resources Corp., 458 F.3d 332 (4th Cir.2006), the conduct Liberto complained of as a matter of law did not rise to the level of actionable harassment. However, I part ways with the majority on the question of whether that determination necessarily resolves the retaliation claim as well. See Ante, at 360 (“In the circumstances of this case, if no objectively reasonable juror could have found the presence of a hostile work environment, as we hold today, it stands to reason that Liberto also could not have had an objectively reasonable belief that a hostile work environment existed.” (emphasis in original)).
The relevant provision of Title VII, protecting against retaliation, reads:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this title.
*363 42 U.S.C. § 2000e-3(a). “The plain meaning of the statutory language provides protection of an employee’s opposition activity when the employee responds to an actual unlawful employment practice.” Jordan, 458 F.3d at 338. Nevertheless, we have also held that “opposition activity is protected when it responds to an employment practice that the employee reasonably believes is unlawful.” Id. (emphasis in original). Thus, even if the practice opposed does not actually violate Title VII, opposing the practice can be protected conduct if the employee has “an objectively reasonable belief that a violation is actually occurring based on circumstances that the employee observes and reasonably believes.” Id. at 341.
In determining whether that standard is met here, I believe it is important to recognize that even “[a] single, sufficiently severe incident ... may suffice to create a hostile work environment.” Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 579 (D.C.Cir.2013) (Kavanaugh, J., concurring) (concluding that supervisor’s statement to African-American employee, “Get out of my office nigger,” was sufficient by itself to constitute an actionable hostile work environment). We have explained before that “[f]ar more than a ‘mere offensive utterance,’ the word ‘nigger’ is pure anathema to African-Americans.” Spriggs, 242 F.3d at 185. And Liberto may well have held the same belief about the term “porch monkey.” See id. (noting that the “constant use of the word ‘monkey’ to describe African Americans was similarly odious” to the use of the word “nigger”).
We, of course, held in Jordan that an offensive racial remark made by a coworker did not amount to actionable harassment, but, in so doing, we emphasized that the complained-of incident was only “a singular and isolated exclamation [that was] not ... repeated ... before or after” and that it was directed at criminals on television who had been captured, not at the plaintiff or any fellow employee. Jordan, 458 F.3d at 340. Here, in contrast, Clubb called Liberto herself a porch monkey and did so in the context of angrily threatening to speak with her friend, the hotel owner, to get Liberto fired. Also in contrast to Jordan, Clubb’s use of the epithet was not a single, isolated occurrence, as she called Liberto the very same name in the very same threatening context the very next day. Particularly in light of these significant differences, I believe that Liberto could have reasonably believed that Clubb’s conduct was actionable.
I share in the sentiment Judge King expressed so well in his dissent in Jordan that our very narrow interpretation of what constitutes a reasonable belief in this context has “place[d] employees who experience racially discriminatory conduct in a classic ‘Catch-22’ situation.” Id. at 349 (King, J., dissenting). They can either report the offending “conduct to their employer at their peril,” id. at 355 (King, J., dissenting), as the Supreme Court has essentially required them to do in order to preserve their rights, see Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), or they can “remain quiet and work in a racially hostile and degrading work environment, with no legal recourse beyond resignation,” Jordan, 458 F.3d at 355 (King, J., dissenting). Like Judge King, I cannot accept that an employee in circumstances like these can be forced to choose between her job and her dignity. See id. at 356. For these reasons, I respectfully dissent from the affirmance of the summary judgment against Liberto on her retaliation claims.

 When Liberto was first introduced to Clubb, Clubb told her, "[Y]ou look like Stacy, but Stacy’s nice.” J.A. 212.