**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-1638**

———————

LEILA CATHERINE JOHNSON,

        Plaintiff – Appellant,

v.

GLOBAL LANGUAGE CENTER,

        Defendant – Appellee.

———————

Appeal from the United States District Court for the Eastern District of Virginia at Alexandria.  Leonie M. Brinkema, District Judge.  (1:20−cv−00631−LMB−IDD)

———————

Submitted:  April 25, 2023                              Decided:  May 25, 2023

———————

Before WILKINSON, HARRIS, and RICHARDSON, Circuit Judges.

———————

Affirmed by unpublished opinion. Judge Wilkinson wrote the opinion in which Judge Harris and Judge Richardson joined.

———————

**ON BRIEF:**  Jack Jarrett, ALAN LESCHT AND ASSOCIATES, PC, Washington, D.C., for Appellant.  Cortland C. Putbrese, Richmond, Virginia, Thomas M. Dunlap, DUNLAP BENNETT & LUDWIG PLLC, Vienna, Virginia, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Global Language Center (GLC) fired Leila Johnson after she sent a lengthy email to State Department officials complaining about the rumored selection of her new supervisor. GLC claimed the email was unprofessional. Johnson claimed the email was Title VII protected activity. The district court granted summary judgment in GLC's favor, finding that Johnson's "diatribe" email was not protected. Because we agree that Johnson's email does not fall within the ambit of Title VII protected activity, we therefore affirm.

## I.

GLC is a private company that contracts with the State Department's Foreign Service Institute (FSI) to provide foreign language instructors. Leila Johnson worked for GLC as one such language instructor in the Arabic department. Much of Johnson's work was thus overseen by FSI employees. Johnson was initially hired in 2016 then terminated a year later. She was later rehired by GLC in August 2017. Her first termination is not at issue. This case concerns Johnson's second termination on August 9, 2018.

The parties agree that the primary event leading to her second termination was an email sent by Johnson on August 7, 2018. For context, this email arose when Johnson heard a "rumor" that an FSI employee named Tanya Matar might be selected as Johnson's supervisor. J.A. 733. Johnson claims she had many professional and personal problems with Matar from their previous work together. Their purportedly fraught history prompted Johnson to send the following email to three superior officials in the State Department with the subject line "Leadership." J.A. 733. She did not send the email to anyone at GLC. We provide the email in full as it underlies the central dispute of the current case:

2

Good Morning

Hope this email finds you well. I was away for a while on a great vacation, but it's good to be back. I miss being in the classroom with my students.

I have heard a rumor that Ms. Tanya Matar is a candidate to replace one of our supervisors in the Arabic Department. Unfortunately, I feel compelled to put it on the record that I can not work under her supervision in good conscience, knowing what I know.

I am compelled to inform you of highly unethical and unprofessional behavior on Ms. Matar's part. After that, the ball is in your court, but please understand that I fear retaliation, and I have had enough of emotional strain, I can no longer go home feeling like I did for the past two years.

My colleagues and I have been victims of continuous harassment, both sexual and emotional. We held a focus group in which we specifically asked to not have an Arabic Supervisor in the Arabic section back in June. I went to Mr. Petrosian right before I left on my vacation, expressing concern that Ms. Matar might be eligible to switch to this department and shared information with him about her behavior.

While I know that Ms. Matar has been working hard on preserving a professional image of herself, I will go ahead and tell you of what is underneath that image.

- Ms. Matar referred to her head of division, Dr. Red back then, as an "A word" (documented in a text message). She referred to one of my supervisors, Mr. Nazir, as an "A Word" (documented in a text message). At that time, I was newly employed, and I needed to trust my leadership. She referred to most of the female leadership as "Wh word" – for example Roula Hickman and Moungia (can't remember last name), claiming they slept their way up.

- Roula Hickman and Tanya Matar were not on talking terms at the time I met Ms. Matar. She claimed that Ms. Hickman sent her an email asking her not to bother her while she worked because she loses her focus. Tanya flipped out because Roula had something "documented" on her - which was always Tanya's fear, documentation.

- When I went to Ms. Matar after my incident of sexual assault, her being a supervisor, she advised me NOT to report it to anyone or I would get fired. She then used this incident to extract information from the involved parties.

3

- When I informed Ms. Tanya that Mr. Adlan was making advances on me, she went and told Roula (while still claiming they did not talk). This caused Roula (who Adlan claimed to have a 9-year affair with) to start harassing me around the department. You know the rest of that story; eventually I was sexually assaulted and emotionally harassed. I tried to address both forms of harassment and got myself fired because of it. However, to stay on point, it was Tanya, my supposed friend back then, who told Roula of Adlan's pursuit, which put us all under insurmountable stress, eventually getting me into doctor's offices, CAT scan, MRI testing before I was released from my job, due to stress.

- She claimed to have awarded her subordinates when she was back in ALERT to keep them "loyal". She said that Zouheira (last name?) is her "Gossip Girl" - It is not accidental that ALL of her employees this year got awards while none of Martin's did and only direct hires on Danusia's team did. Ms. Matar has professionally manipulated and abused the award system. It no longer reflect [sic] ethics and hard work. The awarding system in this department is arbitrary, and alone is an issue of it's [sic] own.

- She flirted with one of the students under her supervision back in ALERT (documented in a text message) whose wife, Stacy, was our student in the Arabic Department. Stacy suffered emotionally, and I informed Ms. Matar (all documented) that the wife is suffering because Ms. Matar was overtly, and purposefully flirting with the husband. I asked her to stop it and to be kind because the lady was becoming visually a wreck. I told Ms. Matar that although she is single, there are a lot of "fish in the sea." I asked her to join a dating app; after all, I met my husband in that manner. She continued to mess with Stacy's head. If you need evidence, you can reach out to the student herself, who did not file an official complaint but complained about what was happening to us. Ms Matar referred to Ms. Stacy often as a B•••• - She often would counteract my proposals to tone things down with a phrase "I want to Eff with them."

- She coached a contractor, Souraya (last name?), on her upcoming interview to become a direct hire by giving her the questions ahead of time. I know this because she told me ahead of time, and indeed, Souraya became a Training Specialist.
She informed me that she was on a panel that decides who gets hired. She would also tell me who applied for the job, and who she will definitely not consider. She mocked several people in the department often, informing me of the numerous times they applied for jobs, and how they were turned down. I can not emphasize how much she looks down on her subordinates and her

4

colleagues, and definitely I can not stress how many of them she dislikes. All of them are in the Arabic Department today, with the exception of Atef Nazir, whom she hates with ferver [sic]. She only respects Dr. Walid, and says that he supports her and knows that everyone else is "jealous" of her.

- She would tell me the personal information of students that she was interested in - information which I should not have had access to, such as their age, history, postings, and so on. I remember that she showed me the information of one Christopher Clark among others. Disturbing information, and misinterpretation of male students behaviors in the department. (Some is documented by text[.])

If you want, I have documented records that I can share with you. I hope that this is sufficient to make you reconsider her for this position in our department. She displays bias, prejudice, and favoritism in a professional setting. She plays the victim card to get on people's good side but then will turn against them with silent hatred and vengeance.

When I started out, I took Tanya into my home, introduced her to my family, and met with her socially outside of work. Today, Ms. Matar does not talk to me at all. The last time she spoke to me was December 2016. She excludes me from conversations and ignores my presence entirely. I am not complaining, per se, but that dynamic would be difficult to work with if she becomes our supervisor.

I would like to ask the department to further reevaluate the training process for one to become a supervisor. This is not just a matter of worry that a person like Ms. Matar could become a supervisor here, for us. It is a worry that someone like Ms. Matar can still be a supervisor at all. We are good people, we work really hard, many of us love what they do, we deserve better. Knowing that I shared with you 10 percent of what I know. The rest I need to keep to myself, because it is uglier, and darker.

Intertwined relations and personal connections have played a long and strong hand so far in our NEA world, is it at all possible to review and re-administer professionalism via intensive workshops for the supervisors in this department?

In the end, I trust that you have our best interest, and the best interest of the students at heart. The department counts on your judgment and follows your lead.
Sincerely,
Leila C. Johnson

5

J.A. 733–35. The primary addressee of the email, the Dean of the School of Language Studies within FSI, responded that same day. She said that Johnson needed to express these concerns to GLC and that the State Department does not allow contractors to pick their FSI supervisors. Johnson replied later that day to the same three State Department officials and copied her program manager within GLC. She explained, "I sent an email with what I knew and thought crucial information to the department's leadership. . . . My email was about misconduct, among other things, that I felt compelled to report. . . . Again, I thought this was detrimental information." J.A. 741. GLC terminated Johnson two days later for what they perceived as unprofessional behavior, stating that "Johnson's actions this morning and in the past" made them "move directly to termination." J.A. 746.

Johnson sued GLC in 2020 alleging violations of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, *et seq*. The district court dismissed all claims except one: that Johnson's termination on "August 9, 2018 was in retaliation for protected activity." J.A. 51. GLC then moved for summary judgment on the remaining claim. On April 27, 2021, the district court granted the motion in GLC's favor. The court found that Johnson failed to make a prima facie showing of retaliation as required by Title VII for two reasons. First, Johnson's August 7 email was not protected activity for it was "a somewhat rambling diatribe about State Department people" that no "reasonable juror" would find qualifies as "actual protected activity." J.A. 1049, 1060. Alternatively, even if Johnson's email constituted protected activity, there were "non-pretextual," non-retaliatory reasons why GLC terminated Johnson. J.A. 1060. Johnson timely appealed.

6

II.

"We review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the nonmoving party." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 326 (4th Cir. 2018) (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276 (4th Cir. 2015)). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Importantly, to create a genuine issue of fact, the "nonmoving party must rely on more than conclusory allegations, mere speculation," or the "mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

A.

Title VII forbids discrimination against an employee "on the basis of race, color, religion, sex, or national origin." *Strothers*, 895 F.3d at 327 (citing 42 U.S.C. § 2000e-2). Title VII also prohibits discrimination against any employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Employee actions that oppose unlawful practices thus constitute protected activity under Title VII. *See Boyer-Liberto*, 786 F.3d at 281.

Generally, employees "engage in protected oppositional activity when, inter alia, they complain to their superiors about suspected violations of Title VII." *Id.* (internal quotation marks omitted). Those complaints, however, are subject to two important caveats. For an employee's "activity to constitute protected 'opposition,' she must show (1) that she reasonably believed that the employment action she opposed constituted a Title

7

VII violation, and (2) that her conduct in opposition was reasonable." *Netter v. Barnes*, 908 F.3d 932, 937–38 (4th Cir. 2018) (internal quotation marks and citations omitted); *see also Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1141 (11th Cir. 2020) (collecting cases). Therefore, not every complaint that merely mentions retaliation or harassment warrants the protections of Title VII. *See, e.g.*, *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998).

Protected activity is essential to a successful Title VII-retaliation claim. It is the first ingredient in a prima facie showing of unlawful retaliation: A "prima facie case of retaliation under Title VII" requires a plaintiff to prove "(1) that she engaged in a protected activity, which includes complaining to her superior about sex discrimination or harassment; (2) that her employer took an adverse action against her; and (3) that there was 'a causal link between the two events.'" *Wilcox v. Lyons*, 970 F.3d 452, 460 (4th Cir. 2020) (quoting *Boyer-Liberto*, 786 F.3d at 281). With this in mind, we turn to the case at hand.

B.

Johnson's retaliation claim falters at the first step because her August 7 email is not protected activity under Title VII. As discussed below, Johnson's brief and tangential invocations of "retaliation" and "harassment" without more do not rise to the level of protected activity. The full email reads like what the district court correctly described as a "rambling diatribe" with much "innuendo about personal stuff." J.A. 1049, 1060. The email's context, moreover, reinforces that its intended purpose was not to oppose Title VII violations but was to express Johnson's personal opposition to her rumored supervisor and the State Department's methods for selecting supervisors.

8

1.

The email's brief mention of "retaliation" and "harassment" is not enough to constitute protected activity. Though Johnson quickly states toward the beginning of the email that she "fear[s] retaliation," and that she has been the victim of "continuous harassment, both sexual and emotional," J.A. 733, the predominant tenor of the email is one of recounting personal conflicts regarding Tanya Matar.

The only discussion of sexual assault with any detail appears in the eighth and ninth paragraphs of the email. Even there, however, Johnson delivers a short description of how previous incidents of sexual assault or harassment relate to Matar. The email then says, "However, to stay on point, it was Tanya, my supposed friend back then, who told" another employee of the incident "which put us all under insurmountable stress." J.A. 733. Johnson herself seems to admit that the discussion of sexual assault is tangential to the main "point" of her email. Despite continuing for nine more paragraphs, the email does not again mention harassment, assault, or retaliation.

Although Johnson's email makes vague and sporadic references to "retaliation" and "harassment," these unspecific statements are insufficient to qualify as protected activity. Read against the backdrop of the rest of the email, these sparse references to potentially problematic behavior are surrounded by what can only be called personal gossip. Examining the email in full reinforces this conclusion.

2.

By presenting a mix of professional and personal concerns, Johnson's email as a whole raised complaints not about Title VII but about Matar becoming a supervisor.

9

The email begins by saying that Johnson has "heard a rumor that Ms. Tanya Matar is a candidate to replace one of our supervisors," and that she feels "compelled to put it on the record that I can not work under her supervision in good conscience, knowing what I know." J.A. 733. Johnson, however, does not follow this with an explanation of why she cannot work under Matar because of past sexual harassment or potential retaliation. Though she mentions harassment, as discussed above, Johnson instead goes into several paragraphs of accusations ranging from professional to interpersonal, none of which reasonably implicate Title VII.

Johnson reported that Matar talked about coworkers using foul language, "professionally manipulated and abused" the department's award system to make people "loyal" to her, and "flirted with one of the [married] students under her supervision" to allegedly "mess with [the spouse's] head." J.A. 733–34. Johnson further claimed that Matar would gossip about other students with Johnson, sharing "[d]isturbing" personal details about the students Matar "was interested in." J.A. 734.

The email concludes with Johnson telling the State Department that she hopes "this is sufficient to make you reconsider [Matar] for this position in our department," and that she "would like to ask the department to further reevaluate the training process for one to become a supervisor" because her "worry" was "that someone like Ms. Matar can still be a supervisor at all." *Id.* She then asks if it is "at all possible to review and re-administer professionalism via intensive workshops for the supervisors in this department?" *Id.*

Taken as a whole, it is apparent that this email is not meant to "complain to [] superiors about suspected violations of Title VII." *Boyer-Liberto*, 786 F.3d at 281. The

10

professed goal of the email was instead to get the State Department to reconsider Johnson's rumored supervisor and to change the way they select supervisors. The final lines of the email confirm this goal: Johnson explained that she was "not complaining, per se, but that dynamic would be difficult to work with if she becomes our supervisor." J.A. 734. She then stated, "Knowing that I shared with you 10 percent of what I know. The rest I need to keep to myself, because it is uglier, and darker." *Id.* She thus disavows any complaints and says nothing further about retaliation or harassment.

### 3.

If this were not enough, the context of the correspondence further bolsters the conclusion that Johnson was not opposing potential Title VII violations and thus not engaging in protected activity. Johnson in fact made the subject of her email "Leadership," J.A. 733, not "Title VII Concerns," "Retaliation Concerns," or something of that nature. There is, to be sure, no "magic words" requirement for registering a Title VII complaint with an employer, *see Okoli v. City of Baltimore*, 648 F.3d 216, 224 n.8 (4th Cir. 2011), and an email regarding "Leadership" *could* raise Title VII questions depending on the content of the email. As we have already discussed, however, the content of Johnson's email did no such thing. Furthermore, once Johnson received a response from a State Department official informing her that contractors are not allowed to pick their FSI supervisors, rather than clarify that she wished to raise retaliation or harassment concerns, Johnson responded that she "sent an email with what I knew and thought crucial information to the department's leadership." J.A. 741.

11

What's more, Johnson, an employee of GLC, sent this email to FSI officials to complain about a State Department employee. In sending this email to FSI leadership within the State Department, the very entity on which GLC relies for its federal contracts, Johnson sought to air her grievances in the hopes that the State Department reconsider Matar's selection and reform their selection process as a whole. This behavior could have soured the relationship between FSI and GLC. "Title VII was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." *Laughlin*, 149 F.3d at 260. Rather than countenance such disruption, our judicial review must balance "the purpose of the Act to protect persons engaging reasonably in activities opposing discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Id.* at 259 (internal quotation marks omitted). The context of this email reveals that Johnson was not conveying information about Title VII violations; she was attempting to disrupt FSI's rumored personnel decision.

All told, Johnson's conduct is "not akin to the measured responses . . . that we have approved in the past." *Laughlin*, 149 F.3d at 260. The email's vague mentions of "retaliation" and "harassment" do not suffice as Title VII protected activity. Moreover, the email's content and context show that Johnson's goal was not to reasonably raise Title VII concerns. The district court was correct to hold that Johnson did not engage in protected activity and therefore did not establish a prima facie case of retaliation. *See id.* Because Johnson's case fails at step one, we therefore need not consider whether GLC unlawfully retaliated against her because of such activity.

## III.

The judgment of the district court is affirmed.

*AFFIRMED*