*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

AARON MINNER,

       Plaintiff-Appellee,

v

GENERAL MOTORS LLC,

       Defendant-Appellant,

and

JEFF LUGGER,

       Defendant.

UNPUBLISHED
June 6, 2024

No. 363462
Genesee Circuit Court
LC No. 18-111875-CD

---

Before: MARKEY, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

In this action under the Elliott Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*., defendant General Motors LLC appeals by leave granted[1] the trial court's June 9, 2022 opinion and order granting in part and denying in part its motion for summary disposition under MCR 2.116(C)(10). On appeal, defendant argues that the trial court erred by denying its motion for summary disposition with respect to plaintiff Aaron Minner's ELCRA claims for race discrimination and hostile work environment. We affirm in part, reverse in part, and remand to the trial court for further proceedings.

I. FACTS

---

[1] See *Minner v Gen Motors LLC*, unpublished order of the Court of Appeals, entered March 23, 2023 (Docket No. 363462).

On November 8, 2018, plaintiff, a black male, filed his complaint against defendant,[2] alleging that he was hired by defendant in 1994 but terminated by defendant on June 15, 2018. Plaintiff maintained ELCRA claims for (1) race discrimination resulting in his termination, (2) retaliation, and (3) racially hostile work environment.

On January 4, 2022, defendant moved for summary disposition pursuant to MCR 2.116(C)(10). In the accompanying brief, defendant argued that plaintiff's race-discrimination claim fails because "[t]here is no evidence showing that the decision-maker (who is also African-American and who Plaintiff plainly testified did *not* discriminate against him) was predisposed to discriminate or that similarly situated employees outside of Plaintiff's protected class were treated more favorably under similar circumstances." In addition, defendant argued that "Plaintiff cannot demonstrate that GM's legitimate reason for his termination—its investigation concluding he sexually harassed a subordinate—was pretext for race discrimination." With regard to the retaliation claim, defendant argued that plaintiff "did not engage in any legally protected activity." Finally, with regard to the hostile-work-environment claim, defendant argued that the alleged events "do not rise to the level of being sufficiently severe and pervasive," and plaintiff cannot demonstrate that defendant had notice of the alleged harassment.

The documents attached to defendant's motion for summary disposition indicated the following facts. On March 21, 2018, an anonymous complaint was lodged against plaintiff through "GM Awareline," which stated, in relevant part:

> Chassis 2 GROUP LEADER Aaron L. Minner is aggressive, argumentative, unprofessional, crude, a liar, disrespectful, and hostile attitude towards employees. He yells at employees. . . . He is lazy and sleeps at his desk about 3-4 nights per week between 3:30 a.m. and 5:30 a.m. . . . He needs to be held accountable for his actions instead of moved from area to area. His behavior needs to be investigated.

Investigation of the complaint was assigned to Marci Laurencelle, a salaried investigator for several plants operated by defendant. Laurencelle began her investigation by questioning business manager Mike Templeton about plaintiff. Templeton opined that plaintiff was aggressive and unprofessional. Laurencelle then questioned Menzo Dodge, an employee under plaintiff's supervision, about plaintiff. Dodge similarly opined that plaintiff was aggressive and unprofessional. Laurencelle's interview notes included the following entry about what she was told by Dodge:

> Harassment, hourly employee [HP], Aaron is trying to get in her pants real hard. It's not the first time, she is afraid to go to labor. He wants to meet her July 18th over shut down. She is scared she won't get days off. He walks by her and shows 1 finger, 2 fingers and three fingers, and he asked her what that met [sic] and she said he said he likes three things, perfume, panties and pussy. She fears

---

[2] The complaint also identified Robin Dugger as a plaintiff, but her race-discrimination claim against defendant was severed by the trial court. Jeff Lugger, who was originally named as a co-defendant, was later dismissed by the trial court as well. We will thus refer to General Motors LLC as the singular "defendant."

retaliation, she is a single mom and needs days off and is scared if she reports it he won't approve her time off.

Laurencelle consequently interviewed HP. Laurencelle's interview notes indicate that HP reported that plaintiff "made the comments that he likes the three P's," that plaintiff would frequently ask her to meet him outside of work, that plaintiff "makes me feel uncomfy," and that plaintiff told her on one occasion that she "needed a shot of peniscilan." HP said that she did not report plaintiff's harassment of her before that interview because she was afraid of losing her job.

Laurencelle also interviewed Jeff Lugger, a superintendent. Lugger reported that plaintiff repeatedly had payroll issues, that plaintiff had a "letter to file" for an altercation with Templeton in 2017, and that plaintiff "basically said that [Lugger] was a racist" when Lugger said that he needed to arrive earlier to begin his shift.

Laurencelle interviewed Michelle Blalock, a salaried employee. Blalock said that HP told her about plaintiff and that she considered reporting the issue to the company on HP's behalf, but she decided against doing so because HP "has a flirty personality." Blalock added that HP did not specifically indicate whether the comments from plaintiff were unwelcome.

Finally, Laurencelle interviewed plaintiff. Laurencelle was joined by Vinita Evans, an HR supervisor. Plaintiff told Laurencelle and Evans that he was unaware of the meaning of "the three P's" and indicated that he did not harass HP. Plaintiff implied that HP was lying for an unknown reason, and he did not believe that she had issues with people of color.

On March 26, 2018, Laurencelle submitted her investigation report to defendant. Laurencelle found that "[t]he allegation that Minner has been aggressive and hostile toward hourly and salaried employees is substantiated," that "[t]he allegation that Minner sleeps at work is substantiated," that "[t]he allegation that Minner mishandled employees pay is substantiated," and "[t]he allegation that Minner sexually harassed [HP] is substantiated based on witness statements."

Shortly thereafter, in June 2018, Evans, the sole decision-maker, decided to terminate plaintiff. Evans testified at her deposition that her decision only was based upon "the investigation of the sexual harassment. Anything that had to do with pay cards, him sleeping on the job, you know, him yelling and screaming at people, that was not considered at all." Evans believed that the results of the investigation were accurate, and as a black woman she was "very ticked off" that plaintiff would suggest that he was terminated because he is black. Evans explained that she previously had terminated the employment of a white employee for circulating a "skinhead e-mail" because that employee, like plaintiff, violated the company's anti-harassment policy.

Plaintiff, in his deposition, explained that he was employed as a "group leader" supervising hourly employees when he was terminated. Plaintiff stated his belief that Evans did not

discriminate against him, harass him, act in a racially biased way against him, or retaliate against him.[3]  Plaintiff also stated his belief that there was "white privilege . . . on the floor."

Plaintiff identified a few instances of discrimination or harassment against him during his employment.[4]  As one example, at one point, plaintiff consistently wore a pair of black pants and a GM-issued jacket to work, but a woman at the plant said that "she'd be afraid of [him]" if she encountered him outside of work.  As a result, one of plaintiff's superiors reported plaintiff to HR for wearing inappropriate clothing, and plaintiff told Evans that it was "discriminatory" to question his clothing because an assistant plant manager—a position superior to group leader—consistently wore "Michigan State jackets without collars" and jeans as a white man.  Evans replied to plaintiff that "our standard has to be a little higher," which plaintiff assumed signified that the standard for people of color has to be higher.  Evans also told plaintiff that "[s]ometimes we have to do things in a leadership manner."

As another example, plaintiff told Tom Hammett, his immediate supervisor, a few times in early 2017 that Dodge was uncooperative with plaintiff because he was black, and Hammett simply told plaintiff to "handle that situation."[5]  Plaintiff was aware that he could have brought his concerns to Evans, but he did not do so because it would be "pointless."  Plaintiff explained that Evans only "could have done what a human resource personnel manager could do in – in their limited abilities with holding white racist people accountable."[6]

As another example, a white group leader told a story to plaintiff about his son having a black friend, and "in his story he felt – felt it would be okay to say the word 'nigger.' "  Plaintiff told that individual that " 'I want you to know that's not acceptable, even in a story.  Don't do it again.' "  Plaintiff added that " '[i]f you use it again, I'm going to go up front, and I'm sure they're not going to do anything about it.' "

As another example, in 2016, a few white individuals were talking about news event regarding a police officer shooting a person of color, and a couple of them said within earshot of plaintiff that " 'he was probably up to monkey business anyway.' "  Plaintiff inferred that the use of the term "monkey business" in this context was racist, and plaintiff told the individuals that " '[i]t has to stop.  You are not going to get away with being racist or prejudiced or whatever you want to call it while I'm the group leader here in chassis 1.' "

---

[3] In his appellate brief, however, plaintiff characterizes Evans as an "Uncle Tom" and suggests that she does not treat black individuals fairly.

[4] Plaintiff explained that these instances were non-exhaustive, but he could not recall others.

[5] Plaintiff explained that Dodge would refuse to train black employees.  Although Dodge apparently did not expressly admit that fact, whenever plaintiff asked Dodge to train a black employee, Dodge would refuse.

[6] Hammett, in his deposition, denied that plaintiff ever complained about racial issues to him.

Finally, plaintiff explained that at one point, he discovered that someone was approving Dodge for a relatively small amount of overtime every week. Plaintiff eventually learned that Blalock was responsible for the approvals, which apparently was beyond the scope of her authority at the time. Plaintiff brought the matter to his superior and, as a result, Blalock and Dodge developed an intense dislike for plaintiff because they could no longer continue the unwarranted overtime pay.

On January 31, 2022, plaintiff filed his response to defendant's motion for summary disposition. In his response, plaintiff argued that his race-discrimination claim could proceed to trial because he was treated differently than a similarly-situated white employee, Robert Huestis. As plaintiff observed, Huestis was a business manager who had an affair with a subordinate employee who did not directly report to him. Huestis was expressly found to have committed this conduct, but he was not terminated.[7] Plaintiff reasoned that because Huestis was found to have committed sexually inappropriate activity with a subordinate but not terminated, whereas plaintiff himself was found to have committed sexual harassment and was terminated, it may be inferred that he was the victim of discrimination.

Plaintiff also submitted the deposition testimony of Brysen Heath, a group leader. In relevant part, Heath testified that some of the employees believed that plaintiff had been terminated as a result of "bias" when compared with Huestis:

> [S]ome of the team leaders, hourly team leaders from team 5, team 6 over in chassis 2 had some complaints because they felt that there was a bias to where Aaron got fired for what they believed was a setup, an alleged, you know, alleged sexual statement. Whereas, Bob was coming down and they knew what Bob had done because the shop is like a big high school, so if you do something word gets around. So, everybody knew what Bob had been accused of. . . .

On June 9, 2022, the trial court entered its nine-page opinion and order granting in part and denying in part defendant's motion for summary disposition. The trial court denied the motion with respect to the race-discrimination claim, explaining that the fact that Huestis was not terminated for his affair but plaintiff was terminated for sexual harassment indicated that plaintiff was the victim of racial discrimination. The trial court also briefly added that other facts of the case, such as the fact that some employees suspected bias, further supported its conclusion that plaintiff established a genuine issue of material fact with regard to his race-discrimination claim.

With regard to the retaliation claim, the trial court granted the motion for summary disposition, reasoning that plaintiff could not show that his protected activity—the complaint of racial discrimination to Lugger in January 2017—was related to his subsequent termination. Finally, the trial court denied the motion for summary disposition with regard to the hostile-work-environment claim, reasoning that plaintiff was subject to unwelcome conduct that interfered with

---

[7] Evans explained at her deposition that Huestis was not terminated because "[i]t was a mutual agreement to have this marital affair." Evans added that she later terminated Huestis because defendant was able to substantiate that he violated the company anti-harassment policy by touching another employee's hair.

his ability to lead the third shift as a group leader, and he reported that conduct to his superiors, who did not investigate further.

Defendant now appeals, arguing that the trial court erred by denying its motion for summary disposition with respect to the race-discrimination and hostile-work-environment claims.

## II. STANDARD OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "A motion under MCR 2.116(C)(10) . . . tests the factual sufficiency of a claim." *Id*. at 160 (emphasis omitted). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

## III. DISCUSSION

## A. RACE DISCRIMINATION

Defendant argues that the trial court erred by ruling that plaintiff established a genuine issue of material fact concerning his race-discrimination claim, i.e., that plaintiff was terminated because of his race. We agree.

MCL 37.2202(1)(a) of ELCRA provides, in relevant part:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race . . . .

This provision requires "but for causation or causation in fact." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 606; 886 NW2d 135 (2016) (quotation marks and citation omitted).

"In some discrimination cases, the plaintiff is able to produce direct evidence of racial bias. In such cases, the plaintiff can go forward and prove unlawful discrimination in the same manner as a plaintiff would prove any other civil case." *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). Otherwise, "[a] plaintiff can attempt to prove discrimination by showing that the plaintiff was treated unequally to a similarly situated employee who did not have the protected characteristic." *Hecht*, 499 Mich at 607. "An employer's differing treatment of employees who were similar to the plaintiff in all relevant respects, except for their race, can give rise to an inference of unlawful discrimination." *Id*. "In order for this type of 'similarly situated' evidence alone to give rise to such an inference, however, our cases have held that the 'comparable' employees must be 'nearly identical' to the plaintiff in all relevant respects." *Id*. (citation omitted).

In this regard, the *McDonnell Douglas* framework[8] "allows a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *Hazle*, 464 Mich at 462 (cleaned up). "The framework, long used by courts of this state, requires a showing that plaintiff was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct." *Venable v Gen Motors Corp*, 253 Mich App at 473, 476-477; 656 NW2d 188 (2002) (cleaned up).

"Once plaintiff has sufficiently established a prima facie case, a presumption of discrimination arises." *Lytle v Malady (On Rehearing)*, 458 Mich 153, 173; 579 NW2d 906 (1998). "The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's termination to overcome and dispose of this presumption." *Id*. (quotation marks and citation omitted). "Once the defendant produces such evidence, even if later refuted or disbelieved, the presumption drops away, and the burden of proof shifts back to plaintiff." *Id*. at 174. At that point, the plaintiff must "show, by a preponderance of admissible direct or circumstantial evidence, that there was a triable issue that the employer's proffered reasons were not true reasons, but were a mere pretext for discrimination." *Id*.

In this case, the parties do not dispute that plaintiff did not present direct evidence that he was discharged "because of" his race. Instead, the parties dispute whether the trial court correctly ruled that plaintiff satisfied *McDonnell Douglas* framework.[9] We agree with defendant that plaintiff did not satisfy the *McDonnell Douglas* framework, specifically the element concerning a similarly-situated employee.

As noted, to establish a prima facie case under the *McDonnell Douglas* framework, a plaintiff must show, in relevant part, that he or she "was treated unequally to a similarly situated employee who did not have the protected characteristic." *Hecht*, 499 Mich at 608. "[T]he 'comparable' employees must be 'nearly identical' to the plaintiff in all relevant respects." *Id*. (citation omitted). Here, the trial court erred by ruling that Huestis—a white supervisor—was a similarly-situated employee. Plaintiff was accused of making lewd comments to and effectively propositioning a direct subordinate at the workplace during work hours, in violation of the company anti-harassment policy. This behavior was substantiated by an investigator. Indeed, the record indicates that the harassment proceeded to the point where HP worried about her job. In contrast, Huestis had a consensual affair with a lower-ranking employee. Nothing in the record

---

[8] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973).

[9] As framed by the parties, if a race-discrimination plaintiff does not provide direct evidence of discrimination, he or she must alternatively satisfy the *McDonnell Douglas* framework. This is incorrect, although the misunderstanding is reasonable because earlier cases suggested such an approach. As our Supreme Court recently observed in *Hecht*, the *McDonnell Douglas* framework simply is one form of circumstantial evidence that a plaintiff may utilize to establish a discrimination claim. See *Hecht*, 499 Mich at 609. Thus, our conclusion, as explained *infra*, that plaintiff did not satisfy the *McDonnell Douglas* framework does not end our analysis of this issue.

indicates that Huestis was engaged in harassment or other comparable behavior at the workplace when he was disciplined but not terminated.[10] Moreover, when Huestis was found to have violated the company anti-harassment policy for touching an employee's hair, he actually was terminated. Thus, Huestis cannot be deemed a similarly-situated employee to the extent that he engaged in a consensual affair. And, to the extent that Huestis was a similarly-situated employee when he violated the company anti-harassment policy for touching a co-worker's hair, he was terminated. Consequently, defendant's treatment of Huestis does not support an inference of discrimination in plaintiff's case.

Having concluded that plaintiff did not establish a prima facie case of discrimination under the *McDonnell Douglas* framework, the question then becomes whether plaintiff presented other circumstantial evidence of discrimination. See *Hecht*, 499 Mich at 607-608. On this point, plaintiff observes that "Michael Templeton, (Business manager) came into Plaintiff's work area, and in front of Plaintiff's employees, got right into Plaintiff's face, screaming that Plaintiff was a 'Mother Fucker' this and 'Mother Fucker' that. . . . No discipline was issued to Templeton; instead, the Caucasian Shift Leader (Lugger) put paper in Plaintiff's file."[11] In addition, the trial court noted the following facts in concluding that plaintiff presented sufficient circumstantial evidence of discrimination:

> In view of: 1) the testimony that employees suspected bias; 2) Plaintiff's reporting of racial discrimination on the third shift to two shift leaders; 3) the allegation corroborated by Dodge and Blalock that a shift leader had knowledge that Plaintiff had just uncovered Blalock wrongfully paying Dodge and knew that Dodge had ulterior motives toward Plaintiff; 4) Lugger's relaying of Plaintiff's complaints of racial discrimination to Evans, and 5) Evans' taking no action in light

---

[10] While the trial court suggested that Huestis allowed the lower-level employee to accumulate improper attendance issues, Evans testified that she was unaware whether Huestis or another manager allowed the employee to accumulate those issues.

[11] Plaintiff also argues that defendant should be liable for discriminatory termination because Laurencelle was a biased investigator. In this regard, "[u]nder the 'cat's paw' theory of employer liability, discriminatory animus held by a supervisor with no decision-making authority over an affected employee can be attributed to the employer if the biased supervisor's conduct is nevertheless a proximate cause of the adverse employment action against the employee." *Jewett v Mesick Consolidated Sch Dist*, 332 Mich App 462, 473; 957 NW2d 377 (2020). See also *Staub v Proctor Hosp*, 562 US 411, 421; 131 S Ct 1186; 179 L Ed 2d 144 (2011) ("But if the independent investigation relies on facts provided by the biased supervisor—as is necessary in any case of cat's-paw liability—then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor."). There is nothing to suggest that Laurencelle was a biased investigator. The facts identified by plaintiff in support of this assertion—such as the fact that she did not exhaustively investigate the allegation that plaintiff bullied his employees—do not show racial bias.

of the totality of the circumstances, a reasonable trier of fact could conclude that racial discrimination was a motivating factor for the adverse action.

The facts identified by plaintiff and the trial court do not establish a genuine issue of material fact as to discrimination. With regard to the assertion that Templeton was not disciplined for his altercation with plaintiff whereas plaintiff himself was disciplined, the record does not contain sufficient detail from which we may infer that race may have been involved.[12] In any event, Lugger was not involved in the ultimate decision to terminate plaintiff, which was made by Evans solely.

We similarly conclude that the facts identified by the trial court do not show Evans discriminated. The first fact, referring to Heath's testimony that some employees suspected "bias" and suspected that the sexual-harassment allegations were fabricated, does not show unlawful discrimination because the testimony does not indicate whether the "bias" was racially motivated. Moreover, there is no evidence that the "bias" could be attributed to Evans, as opposed to the lower-level employees not involved in the termination decision. Likewise, the second fact, that plaintiff reported alleged racial discrimination to two superiors, does not show racially discriminatory motives by Evans in the termination decision.[13]

The third fact, that Blalock and Dodge allegedly subverted company policy to pay Dodge a limited amount of overtime, does not tend to show that plaintiff was the victim of discrimination. Admittedly, it might show that Blalock and Dodge had a distaste for plaintiff that affected their subsequent interactions with him, but it does not show that Blalock and Dodge had a racial animus against plaintiff, much less that the supposed racial animus played a role in Evans's decision to terminate plaintiff.[14]

The fourth and fifth facts, that Lugger reported plaintiff's allegation of discrimination to Evans but Evans did not investigate it, does not show discrimination in the termination decision.[15] The allegation was limited to the "letter in file" that plaintiff received from Lugger as a result of the altercation with Templeton, during which plaintiff admittedly called Templeton a "fat faggot." Presumably, Evans had sufficient information from Lugger about the altercation to decide whether additional investigation was warranted. Moreover, even assuming that Evans was neglectful in

---

[12] We note that plaintiff admitted that he called Templeton a "fat faggot" during the altercation, which may have been deemed more serious than Templeton's words of aggression.

[13] As noted, plaintiff reported racism to Lugger and, as explained *infra*, to an immediate supervisor, presumably Hammett. Plaintiff claimed to have reported racism to others as well.

[14] The record does not indicate whether and to what extent, if at all, Blalock and Dodge actually subverted company policy.

[15] Lugger testified that he provided information to HR about the altercation between Templeton and plaintiff, and placed a "letter in file" (i.e., a reprimand) for plaintiff in February 2017 documenting the incident. Plaintiff told Lugger that he was a racist for giving plaintiff the "letter in file," and Lugger told Evans that plaintiff believed that he was the victim of discrimination in this regard. Apparently, Evans did not investigate this allegation of discrimination.

her duties to investigate a single allegation of racism, this one instance of neglect does not show that she terminated plaintiff "because of" his race over a year later.  See MCL 37.2202(1)(a).  Simply put, on the basis of the evidence presented by plaintiff and discussed by the trial court, it is wholly speculative to conclude that Evans terminated plaintiff on the basis of his race.

Accordingly, we conclude that the trial court erred by denying defendant's motion for summary disposition with respect to plaintiff's race-discrimination claim.  Plaintiff did not satisfy the *McDonnell Douglas* framework, and the other facts identified by the trial court in its opinion and plaintiff on appeal do not circumstantially show discrimination.  We reverse the trial court to the extent that it concluded otherwise.

## B.  HOSTILE WORK ENVIRONMENT

"[H]arassment based on any one of the enumerated classifications contained in [MCL 37.2202(1)(a) is actionable."  *Downey v Charlevoix Co Bd of Rd Comm'rs*, 227 Mich App 621, 626; 576 NW2d 712 (1998).  "[T]o establish a prima facie case of discrimination based on hostile work environment," a plaintiff must satisfy the following five elements:

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of her protected status; (3) the employee was subjected to unwelcome conduct or communication involving her protected status; (4) the unwelcome conduct was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.  [*Quinto v Cross & Peters Co*, 451 Mich 358, 368-369; 547 NW2d 314 (1996) (cleaned up).]

"[A] hostile work environment claim is actionable when the work environment is so tainted that, in the totality of the circumstances, a reasonable person in the plaintiff's position would have perceived the conduct at issue as substantially interfering with employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment."  *Radtke v Everett*, 442 Mich 368, 372; 501 NW2d 155 (1993).  A plaintiff must identify "specific instances of . . . remarks [or conduct] hostile to a protected class from which an inference of a hostile work environment could be drawn."  *Quinto*, 451 Mich at 370.  "[A] single *verbal* (or visual) incident can . . . be sufficiently severe to justify a finding of a hostile work environment."  *Ayissi-Etoh v Fannie Mae*, 712 F3d 572, 580 (CA DC, 2013) (Kavanaugh, J., *concurring*).  "Respondeat superior liability exists when an employer has adequate notice of the harassment and fails to take appropriate corrective action."  *Elezovic v Bennett*, 274 Mich App 1, 7; 731 NW2d 452 (2007).

In this case, the trial court ruled that plaintiff established a genuine issue of material fact regarding his hostile-work-environment claim, reasoning as follows:

> Plaintiff reported to two shift leaders that, while on the third shift, he experienced racial discrimination.  Plaintiff specifically had trouble with one of his subordinate hourly employees (Dodge).  Plaintiff testified that Dodge refused to provide manpower to Plaintiff to run his lines and refused to train African-American employees.  Plaintiff reported this to his shift leader (Hammett) and stated that he believed Dodge's actions were racially motivated.  Plaintiff further complained to

-10-

Lugger (a shift leader) about Plaintiff's being treated unfairly because of Plaintiff's race, and Lugger told this to Evans. Evans stated in her deposition that, if GM hears that an employee is being harassed or discriminated against, "we are obligated to look into it." Evans never opened an investigation into Plaintiff's complaints of racial discrimination.

Plaintiff is able to establish a *prima facie* case of hostile work environment because he was subject to communication and conduct on the basis of race that was unwelcome and did, in fact, interfere substantially with his ability to lead the third shift as a group leader. He reported the unwelcome racial conduct and communication to his superiors, who, upon knowledge of any racial discrimination, are obligated to look into the situation, and they did not open an investigation.

We agree with the trial court that, at the summary-disposition stage, plaintiff presented sufficient evidence of a hostile work environment in light of the testimony about Dodge.[16] In particular, plaintiff testified that Dodge refused to train certain employees because they were black, which apparently interfered with plaintiff's job as a group leader. According to plaintiff, while Dodge did not make any explicit racial comments, he only would train white people. Plaintiff explained one such conversation with Dodge:

"I'm not going to train people. If you bring me certain people, I'm not going to train them," and anytime I would bring a white person, he would go on the job, provide the training, help and support.

Plaintiff added that he brought Dodge's conduct to the attention of his "immediate supervisor" and a "committeeperson" as "part of the collective bargaining," but plaintiff did not discipline Dodge himself because he wanted to correct Dodge's behavior.

Further, Heath elaborated on his understanding of the situation during his deposition as follows:

Q: Had you ever received any complaints that Mr. Dodge wouldn't train or teach African-Americans the different operations within his area?

A: Yes. I've heard that complaint a number of times and I've heard what he had to say about it.

Q: And what did he have to say about it?

A: He was – he was upset that he had, that he felt that he had to keep training people over and over again that were coming to his team. But most of the time that was the business manager because the jobs that were being covered I believe were

---

[16] To the extent that the trial court observed that Lugger reported plaintiff's allegation of discrimination to Evans but Evans did not investigate, as explained *supra*, we question the significance of this observation.

-11-

sick leave jobs, so people were – so, a lot of times there would be a temp assigned to that job and they would be African-American. And because of the hostility – well, because of the environment, you know, people don't always – people on the team don't always get along, and so, sometimes if they didn't get along with Menzo then they would request to be moved or they'll try to get some type of medical restriction where they can no longer do their job and move on to a different area to get away from him. But yeah, I remember that.

Q: Did you ever hear Mr. Dodge complain that African-Americans were harder to train doing the different operations?

A: His complaint to me is that they don't listen to him, which is a very unique thing for him to complain to me about with me being an African-American and all. But he said people just don't listen to him. I said you're the team leader, you got to figure it out, it's your responsibility to train. It says it in your Local agreement, it says it in the contract, that's one of the responsibilities. . . .

From the testimony of plaintiff and Heath, it is unclear whether Dodge specifically refused to train black employees, or whether Dodge refused to train temporary employees out of frustration, and those temporary employees were typically and coincidentally black. In any event, the former is one reasonable understanding of the testimony, and it is sufficient to sustain plaintiff's hostile-work-environment claim at this preliminary stage.

In particular, with regard to the five elements of a hostile-work-environment claim, (1) plaintiff was black; (2) plaintiff, as a supervisor, was subjected to a subordinate—Dodge—refusing his request to train employees, allegedly because those employees were black; (3) that refusal by Dodge was unwelcome from the perspective of plaintiff as both a black man and a supervisor; and (4) that unwelcome conduct by Dodge interfered with plaintiff's employment duties as a group leader.[17] See *Quinto*, 451 Mich at 368. Finally, the fifth element, respondent superior, is satisfied because plaintiff testified that he discussed his concerns with his "immediate supervisor," presumably Hammett.[18] See *Elezovic*, 274 Mich App at 7. See also *Hitchens v Montgomery Co*, 278 Fed App'x 233, 235-236 (CA 3, 2008) (explaining that Title VII allows for respondeat superior liability for the conduct of an immediate supervisor in certain cases).

For these reasons, we conclude that the trial court did not err by denying defendant's motion for summary disposition with respect to the hostile-work-environment claim.

IV. CONCLUSION

---

[17] While the record is not clear regarding the details of how Dodge's alleged refusal to train black employees interfered with plaintiff's job duties, the clear implication of plaintiff's testimony is that his job was more difficult than it would have been had Dodge trained black employees.

[18] Plaintiff also testified that he mentioned the issue to a "committeeperson," but his testimony implies that this is a union-related position, not a company-related position.

We conclude that the trial court correctly denied defendant's motion for summary disposition with respect to the hostile-work-environment claim, but the court erred by denying the motion with respect to the race-discrimination claim. Therefore, we affirm the trial court in part, reverse in part, and remand to that court for further proceedings consistent with our opinion. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Michael J. Riordan
/s/ Thomas C. Cameron